INTERNATIONAL & G. N. RY. CO. v.
ANDERSON COUNTY et al. †
(No. 1351.)

(Court of Civil Appeals of Texas. Texarkana. Jan. 22, 1915. Supplemental Opinion, Feb. 11, 1915.)

1. RAILROADS ⬅194 — SALE OF PROPERTY AND FRANCHISE—MAINTENANCE OF GENERAL OFFICE.

A railroad corporation organized under Rev. St. 1911, art. 6625, authorizing a purchaser of the property and franchises of a railroad company, sold to pay debts, to form a corporation, under articles 6405–6416, relating to the incorporation of railroad companies, to acquire, maintain, and operate the road so purchased, as if such road were the road intended to be constructed by the corporation, etc., is subject to article 6423, regulating the location by railroads of their offices.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 643–655; Dec. Dig. ⬅194.]

2. RAILROADS ⬅129—LOCATION OF OFFICES —STATUTORY PROVISIONS.

Rev. St. 1911, art. 6423, requiring every railroad company to maintain permanently its general offices within the state at the place named in its charter, and if not so named, at the place where it shall have contracted to locate its general offices and to maintain its machine shops and roundhouses at such place as it may contract to keep them, for a valuable consideration received, prohibits changing the place of the general offices, machine shops, and roundhouses, when once definitely located, and a corporation formed by a purchaser of the property and franchises of a company which had definitely located its general office, machine shops, and roundhouses, is subject to the prohibition.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 392, 393, 399–403; Dec. Dig. ⬅129.]

3. RAILROADS ⬅144 — INCORPORATION OF RAILROADS—LOCATION OF GENERAL OFFICES.

Where an act chartering the I. Railroad Company provided that the principal office should be established at such point on the line of road as might be deemed most convenient, and might be moved from time to time, and an act chartering the H. railroad company, fixed H. as the place for the principal office and the two railroads were consolidated, which consolidation was recognized by the Legislature, as valid, the consolidated corporation could establish its principal office at H., or at such point on the line of its road as might be deemed most convenient, and might move its office from time to time, within Rev. St. 1911, art. 6423, requiring railroad companies to maintain their offices within the state.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 392, 393, 451–455; Dec. Dig. ⬅144.]

4. RAILROADS ⬅36 — INCORPORATION OF RAILROADS—LOCATION OF GENERAL OFFICES.

The provision in Rev. St. 1911, art. 6423, that railroads shall maintain their general offices, machine shops, and roundhouses at such place as they have contracted to keep them for a valuable consideration, and if they are located on the line of road in a county which has aided by a bond issue in consideration of such location, the location shall not be changed, modifies the provision requiring every company to keep its offices at the place named in its charter, and a railroad company must maintain its offices at the place named in its charter, but if located on the line in consideration of county aid by bond

issue, it cannot change the location, even to the original charter place designated in the act of incorporation.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 94; Dec. Dig. ⬅36.]

5. RAILROADS ⬅36—LOCATION OF GENERAL OFFICES, SHOPS, AND ROUNDHOUSES—CONTRACTS—VALIDITY.

A contract within Rev. St. 1911, art. 6423, requiring every railroad company to maintain its general offices, machine shops, and roundhouses at such places as it shall have contracted for a valuable consideration to keep them, and that the general offices, shops, and roundhouses located on its line in a county which has aided by a bond issue in consideration of the location, shall not be removed, must be a contract authorized by a railroad company, or an unauthorized contract adopted or ratified by it.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 94; Dec. Dig. ⬅36.]

6. RAILROADS ⬅36—LOCATION OF GENERAL OFFICES, SHOPS, AND ROUNDHOUSES—CONTRACTS—VALIDITY.

Evidence held to justify a finding that a contract for the location by a railroad company of its general offices, machine shops, and roundhouses in consideration of aid by a county bond issue was made with the knowledge and approval of the board of directors, and hence binding on the company.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 94; Dec. Dig. ⬅36.]

7. COUNTIES ⬅154—AID IN CONSTRUCTION OF RAILROADS—ELECTIONS.

Under the statute authorizing a county to aid in the construction of a railroad, and providing that the order of the court for the election to determine whether a county shall aid shall be entered on the minutes and shall state in concise language the nature of the proposition and the amount of aid, does not require that the order shall state all the terms which the agents of the county and the railroad company have agreed on, either as to work or extent of construction to be done, and there is no limitation on making independent specific stipulations, as the parties may deem proper, as to the extent of construction work.

[Ed. Note.—For other cases, see Counties, Cent. Dig. §§ 228–240; Dec. Dig. ⬅154.]

8. RAILROADS ⬅35 — AID IN "CONSTRUCTION" OF RAILROADS.

The "construction" of a railroad within the statute authorizing county aid in the construction thereof may include the location of offices, shops, and roundhouses.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 75, 77, 78, 88–93; Dec. Dig. ⬅35.

For other definitions, see Words and Phrases, First and Second Series, Construct.]

9. COUNTIES ⬅154—COUNTY AID TO RAILROADS—"DONATION."

The word "donation" in the statute authorizing a county to aid in the construction of a railroad, by taking stock, making a loan, or donation does not mean an absolute gift without any condition or consideration,, but a county aiding in the construction of a railroad by a donation may receive a consideration therefor, such as the location by the railroad company at a designated place of its general offices, machine shops, and roundhouses.

[Ed. Note.—For other cases, see Counties, Cent. Dig. §§ 228–240; Dec. Dig. ⬅154.

For other definitions, see Words and Phrases, First and Second Series, Donation.]

---

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

174 S.W.—20     † Writ of error pending in Supreme Court.

10. RAILROADS ⬷⬵36—CONSTRUCTION—COUNTY AID—CONTRACTS.

A contract between a railroad company and a county voting a donation to aid in the construction of the railroad need not be in writing, or appear in the minutes of the commissioners' court, but may be proved by parol.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 94; Dec. Dig. ⬷⬵36.]

11. RAILROADS ⬷⬵129 — JUDICIAL SALE OF PROPERTY AND FRANCHISES — RIGHTS AND OBLIGATIONS OF PURCHASER.

A bona fide sale of the property and franchises of a railroad corporation does not discharge the obligations of the corporation as to the location of its general offices, machine shops, and roundhouses, but the purchaser assumes the obligations.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 392, 393, 399–403; Dec. Dig. ⬷⬵ 129.]

12. RAILROADS ⬷⬵22—ACTIONS—VENUE.

A railroad corporation required by Rev. St. 1911, art. 6423, to maintain its general offices in a designated county may not rely on a plea of privilege to be sued in another county where it actually maintains its general offices.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 46–50; Dec. Dig. ⬷⬵22.]

13. COURTS ⬷⬵489 — JURISDICTION — STATE AND FEDERAL COURTS.

A suit by a county and a city and citizens thereof, against a railroad company purchasing under a decree of a federal court the property and franchises of another railroad company, to enforce an obligation to maintain general offices, machine shops, and roundhouses in the city, is within the jurisdiction of a state court; for the obligation sought to be enforced is contractual.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 404, 1324–1330, 1333–1341, 1372–1374; Dec. Dig. ⬷⬵489.]

14. CONSTITUTIONAL LAW ⬷⬵42—IMPAIRING OBLIGATION OF CONTRACTS—STATUTES—VALIDITY.

Where a railroad company authorized by its charter to locate its general office at a designated city contracted, for a valuable consideration, to locate elsewhere, and thereby became obligated, under Rev. St. 1911, art. 6423, to maintain the same at the latter place, a purchaser of the property and franchises of the railroad company could not complain of the statute as impairing the obligation of charter contract.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 39, 40; Dec. Dig. ⬷⬵42.]

15. DOMICILE ⬷⬵9—EVIDENCE—INTENTION.

The acts of one are admissible to show his intention to establish a domicile.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. § 38; Dec. Dig. ⬷⬵9.]

16. DOMICILE ⬷⬵8 — ACQUISITION OF DOMICILE—PRESUMPTIONS.

A domicile, once acquired, is presumptively retained until otherwise shown.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. §§ 36, 37; Dec. Dig. ⬷⬵8.]

17. CORPORATIONS ⬷⬵52—RESIDENCE OF CORPORATIONS.

A corporation is a resident citizen of the state creating it.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 140–150; Dec. Dig. ⬷⬵52.]

18. CORPORATIONS ⬷⬵52—CREATION—LEGISLATIVE POWER.

The state, having the power to create a corporation, may fix by initial legislation the locality within the state for the location of its governing offices.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 140–150; Dec. Dig. ⬷⬵52.]

19. CONSTITUTIONAL LAW ⬷⬵70 — LEGISLATIVE POWER.

The power to regulate and reasonably govern the operation of railroads in the public interest and convenience is legislative, and the courts will not interfere.

[Ed. Note.—For other cases, see Constitutional Law, Cent.Dig. §§ 129–132, 137; Dec.Dig. ⬷⬵70.]

20. CONSTITUTIONAL LAW ⬷⬵129—RAILROADS ⬷⬵223 — IMPAIRMENT OF OBLIGATION OF CONTRACTS — REGULATION — LOCATION OF GENERAL OFFICES, SHOPS, AND ROUNDHOUSES.

Rev. St. 1911, art. 6423, providing for the location by railroads of their general offices, machine shops, and roundhouses, is regulatory within the police power of the state, and does not impair the obligation of charter contracts.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 296, 301, 362–413; Dec. Dig. ⬷⬵129; Railroads, Cent. Dig. §§ 725–729, 738; Dec. Dig. ⬷⬵223.]

21. CONSTITUTIONAL LAW ⬷⬵241 — EQUAL PROTECTION OF THE LAWS—STATUTES.

This statute applies to all railroad corporations alike, and is not invalid as denying the equal protection of the law because not including individuals and receivers operating railroads.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 700, 701; Dec. Dig. ⬷⬵ 241.]

22. STATUTES ⬷⬵64 — PARTIAL INVALIDITY — EQUAL PROTECTION OF LAWS.

Where the penalty provision of a statute is severable and no penalties are inflicted, the invalidity of the penalty provision does not render invalid the other provisions as denying the equal protection of the law.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 58–66, 195; Dec. Dig. ⬷⬵64.]

23. RAILROADS ⬷⬵223 — REGULATIONS — RETROACTIVE STATUTES.

Rev. St. 1911, art. 6423, regulating the location by railroads of their general offices, machine shops, and roundhouses, is not retroactive, as against a corporation subsequently incorporated, though purchasing the property and franchises of a railroad company incorporated prior to the statute.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 725–729, 738; Dec. Dig. ⬷⬵223.]

24. COMMERCE ⬷⬵58—INTERSTATE COMMERCE —INTERFERENCE BY STATE STATUTES.

This act is not void as a direct regulation of interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 77–86, 100; Dec. Dig. ⬷⬵58.]

Supplemental Opinion.

25. JUDGES ⬷⬵45—DISQUALIFICATION—RELATIONSHIP TO PARTIES—WHO ARE "PARTIES."

Where a suit is brought by plaintiffs, suing for themselves and in behalf of all others like interested and situated, the persons not named are not "parties" within Const. art. 5, § 11, prohibiting any judge from sitting in any case where either of the parties may be connected with him by affinity or consanguinity.

[Ed. Note.—For other cases, see Judges, Cent. Dig. §§ 208–212; Dec. Dig. ⬷⬵45.

For other definitions, see Words and Phrases, First and Second Series, Party.]

Appeal from District Court, Cherokee County; A. E. Davis, Judge.

⬷⬵For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Action by Anderson County and others against the International & Great Northern Railway Company. From a judgment for plaintiffs, defendant appeals. Affirmed.

See, also, 156 S. W. 499.

The appellees, the county of Anderson, the city of Palestine, and certain citizens suing for themselves and in behalf of all other like interested and situated members of the public in the city of Palestine, brought this suit in the district court of Anderson county, Tex., against the appellant company. Properly construing the appellees' petition in the light of the facts therein set out and in accordance with the relief asked by the prayer, the suit is in the nature of the prevention of the continuance of an illegal act upon appellant's part in violation of applicatory legislative provisions of the state to railway companies in respect to location and maintenance of general offices, machine shops, and roundhouses, working injury especially to appellees without remedy at law, and seeking to interrupt the continuance of such wrongful violation of the statutes governing appellant by equitable interference at the hands of the court. Under the facts given in the petition the prayer was for a decree "enforcing the public duty of defendant to forever keep and maintain its general offices, machine shops, and roundhouses in the city of Palestine" and "for a mandatory injunction commanding the defendant to at once desist and refrain from keeping or maintaining any other general offices in connection with the operation of said railroad at any other place than the city of Palestine, and commanding and requiring the defendant to keep and maintain all of the general offices for the operation of said railroad at the city of Palestine." Statement of such pleading is fully made in the former appeal in 156 S. W. 499, which is here adopted and can be referred to. The appellant seasonably filed a plea of privilege of trial in the district court of Harris county, Tex., which was overruled, and the venue then was, on motion, changed to Cherokee county. Appellant pleaded to the jurisdiction of the district court of the state to hear and determine the controversy, averring to the effect that if any claim or liability in the matter pleaded existed in favor of the plaintiffs, decree of foreclosure in the United States Court for the Northern District of Texas had reserved jurisdiction to try and determine same, and had exclusive jurisdiction thereof. As the matters averred in that respect fully appear in the record without dispute, it is deemed unnecessary to repeat them here. Besides demurrer and special exceptions to the petition, and denials as to the merits of the controversy, the appellant pleaded statutes of limitation of two and four years, and the statute of frauds, in bar of the action. Appellant further specially seasonably interposed by proper pleas defenses as federal questions founded upon the Constitution of the United States, which later on will be specifically adverted to. A trial to a jury resulted in special findings of fact affirming the existence of the material facts pleaded by appellees. On these findings a decree was entered in accordance with the prayer of the appellees' petition, perpetually enjoining and restraining the appellant company from changing the location of the machine shops and roundhouses from Palestine, and from keeping and maintaining general offices at any other place than Palestine, Tex.

In deference to the findings of the jury, as having support in evidence, we find that on or about the 15th day of March, 1872, the Houston & Great Northern Railroad Company, acting by its president, contracted and agreed with the citizens of Palestine, acting by John H. Reagan, to extend its line of railroad to intersect the International Railroad at Palestine, to establish a depot within a half mile of the courthouse at Palestine, to commence running cars regularly thereto by July, 1873, and to thereupon locate and forever maintain the general offices, machine shops, and roundhouses of the Houston & Great Northern Railroad at the city of Palestine, for and in consideration of an agreement by John H. Reagan to make a thorough canvass of Anderson county to induce the electors of that county to authorize the issuance of interest-bearing bonds of the county in the principal sum of $150,000, and upon the further consideration that Anderson county, on authorization of its electors, should issue and deliver its bonds in the principal sum aforesaid. John H. Reagan made a thorough canvass of Anderson county to induce the electors to vote the bonds, and Anderson county, on authorization of its electors, issued and delivered to the Houston & Great Northern Railroad Company its interest-bearing bonds in the principal sum of $150,000 within a year from the date of the contract and agreement mentioned above. Proceedings in respect to the ordering and issuance of the bonds are in the record for reference. In part performance of and in compliance with the contract and agreement mentioned, the machine shops and roundhouses of the Houston & Great Northern Railroad and of the International & Great Northern Railroad were established at Palestine on or about July, 1873, and thereafter maintained at that place. There is evidence to support the finding that the Houston & Great Northern Railroad Company and the International & Great Northern Railroad Company in point of fact authorized and ratified the action of Galusha A. Grow in making the contract and agreement so made. About the first of the year 1875 the International & Great Northern Railroad Company, acting by its general superintendent, H. M. Hoxie, contracted and agreed with the citizens of the city of Palestine, among whom were the appellees George A. Wright and J.

W. Ozment, to fully and completely perform the previous contract and agreement between the Houston & Great Northern Railroad Company, acting by Galusha A. Grow, and the citizens of Palestine, acting by John H. Reagan, by at once locating the general offices of the International & Great Northern Railroad at Palestine and by thereafter permanently keeping and maintaining the general offices, machine shops, and roundhouses of the International & Great Northern Railroad at Palestine, for and in consideration of certain bonds of Anderson county theretofore issued to the Houston & Great Northern Railroad Company, and for the further and additional consideration that said citizens should at once construct and complete, or cause to be constructed and completed, at their own cost and expense, any and all houses at Palestine, Tex., which might be demanded by said company, in accordance with such plans or directions as might be furnished by the company through its officers, for occupancy at reasonable rentals by employés of said company and their families, and especially by general officers, their families and clerks. The citizens of Palestine within 12 months from the date of the agreement caused to be constructed and completed, at their own cost and expense, certain houses at Palestine, which were all the houses demanded by the International & Great Northern Railroad Company, in accordance with the plans and directions furnished therefor by the company through an officer of same, for occupancy at reasonable rentals by employés of the company and general officers thereof, their families and clerks. There is evidence to support the finding that in point of fact the International & Great Northern Railroad Company authorized and ratified the action of H. M. Hoxie in making the contract and agreement of date early in 1875 mentioned. The jury made a negative answer to a special question as to whether, in the event the appellant should be required to keep and maintain its shops in Palestine permanently, any burden or injurious effect in point of fact would thereby be placed upon or suffered by interstate commerce.

It was further proven that the Houston & Great Northern Railroad Company was chartered by legislative act of date October 26, 1866, set out in the record, and that the International Railroad Company was chartered by legislative act of date August 5, 1870, set out in the record. It was proven that written articles of agreement were entered into February 19, 1872, between the International Railroad Company and the Houston & Great Northern Railroad Company, whereby the two companies agreed "to unite, merge and consolidate their several properties and franchises." The stockholders jointly of both companies ratified this agreement on September 23, 1873. At a meeting of the stockholders of the International & Great Northern Railroad Company, the con-

solidated company, held September 24 and 27, 1873, by-laws were adopted and put in force. By special act of the Legislature in evidence, of date April 24, 1873, the International & Great Northern Railroad Company was authorized to issue bonds and to secure same by mortgage on its road, and, besides other things, provided:

"All acts heretofore done in the name of either of said companies shall be of the same binding force and effect upon the said International & Great Northern Railroad Company that they were upon the respective companies."

A further special act of the Legislature is in evidence, of date March 10, 1875 (Sp. Acts 14th Leg. c. 49) entitled:

"An act for the relief of the International Railroad Company, now consolidated with the Houston & Great Northern Railroad Company under the name of the International & Great Northern Railroad Company."

A complete merger and amalgamation in fact of the two companies into the new company under the name of the International & Great Northern Railroad Company was proven. On April 5, 1875, the president, vice president, and general officers of the new company were elected, and also on that date the board of directors of the company, at the meeting held in Houston, Tex., passed the following resolution:

"Resolved, that the general offices of this company be moved to Palestine in Anderson county, Texas, as soon as practicable, and that it be the duty of the secretary to give timely notice of such removal in the Houston Daily Telegram and the Galveston Daily News."

Meetings of the stockholders and directors were thereafter held there. A list of stockholders of the International & Great Northern Railroad Company was given, and it was proved that all of the annual meetings of the stockholders of the International & Great Northern Railroad Company were held at Palestine, Tex., upon published notice that they would be held, "at the general offices of the company at Palestine," from 1881 to 1911. It was also proven that directors' meetings were held at Palestine from 1881 to 1888, inclusive, but were not held after 1888 until April, 1893, on account of injunction proceedings, at the instance of the state, in the suit of State against Ry. Co., appearing in the record. A lease of the International & Great Northern Railroad was made in 1881 to the Missouri, Kansas & Texas Railway Company, appearing at length in evidence. The state brought suit to cancel the lease, and it was dissolved in 1888. From the date of the lease the general offices were removed from Palestine to St. Louis, and remained there until 1888, when they were returned to Palestine, and have been there since to 1911. The machine shops and roundhouses of the International & Great Northern Railroad Company were moved to and established in Palestine, Tex., about July, 1875, and have remained there continuously since that time. The decree of mortgage foreclosure, the sale, purchase, deed, proceedings, and the charter

of appellant all appear in the record; and it is the purpose to have included in this statement, as a part hereof, all documentary evidence in the record, as same was without dispute, to relieve the necessity of extending this statement, and it should be so understood and considered.

Wilson, Dabney & King, of Houston, Morris & Sims, of Palestine, Andrews, Ball & Streetman, of Houston, F. B. Guinn, of Rusk, F. A. Williams, of Galveston, W. E. Donley, of Rusk, N. A. Stedman, of Austin, and Norman, Shook, & Gibson, of Rusk, for appellant. A. G. Greenwood, of Palestine, Jas. Perkins, of Rusk, Jno. C. Box and R. O. Watkins, both of Jacksonville, Jno. B. Guinn, of Rusk, T. B. Greenwood and Campbell, Sewell & Strickland, all of Palestine, for appellees.

LEVY, J. (after stating the facts as above). The articles of incorporation of the appellant railway company, of date August 8, 1911, and filed with and certified by the secretary of state on August 11, 1911, contain, as far as material, the following:

"Second. This corporation is organized for the purpose of acquiring, owning, maintaining and operating the railroads heretofore forming the International & Great Northern Railroad and purchased by Frank C. Nicodemus, Jr., one of the undersigned, at a sale thereof, held on June 13, 1911, pursuant to a decree of foreclosure and sale entered on or about May 10, 1910, in certain judicial proceedings brought for the foreclosure of a mortgage of the International & Great Northern Railroad Company known as its second mortgage, said decree having been made and entered by the United States Circuit Court for the Northern District of Texas, in a certain cause therein pending, wherein the Farmers' Loan & Trust Company, trustee, was complainant and International & Great Northern Railroad Company and others were defendants, which said decree was subsequently adopted and entered, in certain ancillary causes between the same parties, by the Circuit Courts of the United States for the Southern District of Texas, the Eastern District of Texas and the Western District of Texas; said railroads being described as follows, to wit [Here follows description]. This corporation shall have all of the powers and privileges conferred by the laws of the state of Texas upon chartered railroads, including the power to construct and extend.

"Third. The place at which shall be established and maintained the principal business office, the public office and general offices of this corporation is the city of Houston, in Harris county, state of Texas."

[1, 2] Offering this charter as a defense, as appellant does, and the rightfulness to be a corporation for the purposes and objects declared in the second section thereof being an admitted legal right by statute of this state, there is at once presented, and should be decided, the question, as one purely of law, as to whether or not there is any legal restraint or disability by law or operation of law upon the present incorporation in respect to designating, as the third section certainly does, the "city of Houston" as the precise and exact locality within the state in which to establish and maintain its general offices. Plainly stated in another way, is article 6423, R. S., applicatory to appellant, a new corporation? The question is important of decision, in that if the proposed incorporation was legally at liberty to freely choose the locality in which to establish its offices, then the absolute right to do so would be a complete defense to the controversy; otherwise not so. The controversy here, it may be remarked, is in that very particular. The present corporation comes into existence by authority of article 6625, R. S., which expressly confers the personal right upon the purchaser of the property and franchises of a railway company, in virtue of sale in mortgage foreclosure proceedings, as here, of forming a corporation "under chapter 1 of this title, for the purpose of acquiring, owning, maintaining and operating the road so purchased, as if such road were the road intended to be constructed by the corporation." The act further provides that "when such charter has been filed the new corporation shall have the power and privileges then conferred by the laws of this state upon chartered railroads, including the power to construct and extend," but, as further set out, "provided, that by such purchase and organization no right shall be acquired in conflict with the present Constitution and laws in any respect, nor shall the main track of any railroad once constructed and operated be abandoned or moved." The "chapter 1 of this title," under which the corporation is required to be formed, provides, among other articles, that the incorporators shall adopt and sign articles of incorporation, which shall contain, among other things: "3. The place at which shall be established and maintained the principal business office of the proposed corporation." Requiring, as does the section just quoted, that the precise and exact locality of the principal business or governing office of the proposed corporation shall be given in the articles of incorporation, it was incumbent on the incorporators so to do, in order to have legal compliance with the terms of the section in that respect. And if the general language of the section is alone to be regarded as controlling in defining the right of the incorporators with respect to the choice of locality, then plainly the incorporators had warrant of law and were at liberty to freely make the selection of locality for the governing offices of the railroad. But to regard the general language of the section mentioned as controlling and conclusively defining the right of the incorporators to freely make choice of any locality would be to ignore the effect of the conditions and limitations provided in article 6625 that the "organization," or proposed incorporation, should come into existence as a corporation and acquire the franchise of operating the "road so purchased" with "no right" that would be in conflict with applicatory "laws in any respect." Such conditions and limitations would be legal compulsion, having the force of a charter requirement, upon the proposed incorporation, that it

come into existence only upon applicatory legislative provisions. And it is believed that article 6625 means, and it should properly be so construed, that in giving the proposed corporation the authority to be a corporation, "for the purpose of acquiring, owning, maintaining and operating the road so purchased," it was so done upon the same applicatory legislative provisions to its predecessor. The corporation owning previously "the road so purchased" being under charter obligation to the state to operate the railway as a public carrier for a specified term of years, the state by the statute was in effect insisting that the purchaser and his succeeding corporation should perform that charter obligation to the state, and should not cease, by reason of the foreclosure sale, to operate that railway as a public carrier during such contractual period of time and under same laws applicable to its operation. By taking over the property burdened with such obligation to the state, the purchaser and his succeeding corporation assumed to perform it. We understand the effect of the ruling of the Supreme Court to be that in the former appeal. As the effect of the act is to withhold from and disable the "organization," or proposed corporation, from acquiring any right in conflict with applicatory legislative provisions of its predecessors, it would necessarily follow, as a consequence of such prohibition or restraint, that a provision in the present articles of incorporation which is not responsive to a specification in the law applicatory to the franchise of operating the "road so purchased" would have no force or effect. So considered, article 6423, which is applicatory to location of the offices of railway companies, should be read in conjunction with section 3, above quoted, as consistent with and defining section 3 in specification of the place. Referring to article 6423, it is provided that any railway company chartered by the laws of Texas "shall keep and maintain permanently its general offices within the state of Texas," either (1) "at the place named in its charter," or (2) "if no place is named in its charter where the general offices shall be located and maintained, then said railroad company shall keep and maintain its general offices within this state where it shall have contracted or agreed or shall hereafter contract or agree to locate its general offices for a valuable consideration," or (3) "if said railway company has not contracted or agreed for a valuable consideration to maintain its general offices at any certain place within this state, then such general offices shall be located and maintained at such place on its line in this state as said railway company may designate to be on its line of railway." The act also provides that the shops and roundhouses shall be kept and maintained at the locality where the company may have contracted to keep and maintain them, and further provides that if the railway company makes location of offices, shops or roundhouses at a place on the line of the road, in consideration of the issuance of county bonds, such locality shall thereafter be the place for its general offices, shops, and roundhouses. By requiring, as the article does, that railway companies shall permanently keep and maintain their general offices "at such place within this state," there is intended by that language an express prohibition against changing the place for the general offices, as well as machine shops and roundhouses, that are once definitely so located by operation of the statute. City of Tyler v. Railway Co., 99 Tex. 491, 91 S. W. 1, error to United States Supreme Court dismissed, 162 U. S. 552, 29 Sup. Ct. 684, 53 L. Ed. 649. A restraint or prohibition against changing the locality so fixed by the statute for the general offices carries, as a necessary consequence, prohibition or restraint against the exercise of any right to voluntarily amend or change the charter privilege in that respect, in the absence of further legislative authority to do so. Thus it would plainly appear, we think, that if the International & Great Northern Railroad Company, the predecessor of appellant, stood restrained by force of article 6423, which had united with its charter as a part thereof, of the privilege of changing the locality for its general offices and machine shops and roundhouses, a voluntary change thereof on the part of the International & Great Northern Railroad Company would be in violation of law. Hence that same statute applicatory to its predecessor would attach with all its force to appellant, and be the law governing the appellant in designating the location of its offices, upon the ground that the statute authorizing the new corporation to exist operates to withhold and restrict any right to the proposed incorporation to obtain a charter privilege which is denied by terms of law to its predecessor. I. & G. N. Ry. Co. v. Anderson County (Sup.) 156 S. W. 499. It follows, therefore, that if the appellant had the legal right to fix the "city of Houston" in the articles of incorporation, it would rest entirely upon the ground that article 6423 has not application under the facts in the record to its predecessor, or, if it has application to its predecessor under the facts, that article 6423 is not a valid and binding statute upon constitutional grounds urged.

[3] It then becomes necessary to decide whether or not the record discloses a state of facts under which article 6423 would have application to the International & Great Northern Railroad Company. Here it was proven there was a completed consolidation in 1873 in point of fact of the Houston & Great Northern Railroad Company and the International Railroad Company, under the name of the International & Great Northern Railroad Company. By the compact each company agreed "to unite, merge and consolidate their

several properties and franchises." Each of the two railroads was, in the first instance, chartered by special act of the Legislature. By section 13 of the act chartering the Houston & Great Northern Railroad Company (Sp. Acts 11th Leg. c. 100) it is provided that Houston, Tex., shall be the principal office. By section 8 of the act chartering the International Railroad Company (Sp. Acts 12th Leg. c. 54) it is provided that:

"The principal office of the company shall be established at such point on the line of said railway as may be deemed most convenient for the transaction of its business, and may be moved from time to time to such places on said lines as the progress of the work of construction may render expedient or necessary."

This company was further given the authority that:

"Said company shall have the right to connect itself with any other railroad company, and under such terms as it shall deem best to operate and maintain said railroad in connection or consolidation with any such other railroad company."

By special act of the Legislature in 1874 (Sp. Acts 14th Leg. c. 21) "the International & Great Northern Railroad Company" was empowered to issue bonds and to secure same by mortgage on its road, and it was further provided that:

"All the acts heretofore done by either the Houston & Great Northern or International Railroad shall have the same binding force upon the said International & Great Northern Railroad Company that they had upon the respective companies."

A further special act of the Legislature in 1875 was "for the relief of the International Railroad Company, now consolidated with the Houston & Great Northern Railroad Company under the name of the International & Great Northern Railroad Company," granting to it and its successors and assigns certain state lands in aid of construction, and exempting the consolidated company from taxation for a period of 25 years, and providing that if a majority of the stockholders of the consolidated company should vote in favor of accepting the provisions of the act, this act should become obligatory upon said company and its successors, "and shall be held to be an irrepealable contract and agreement between the state and the said company, its successors and assigns." It is not doubted that it was competent for the Legislature at that date, by curative acts, as is the effect of the acts mentioned, to make recognition of and render valid the consolidation and merger of the two companies, which consolidation and merger might otherwise have been invalid by reason of the want of authority on the part of the Houston & Great Northern Railroad Company to unite and consolidate. Clearly by the terms of the two acts the consolidation was agreed to by the state; and agreeing, as we must assume was contemplated, that the consolidation would have the force under the compact of the companies "to unite, merge and consolidate their several properties and franchises," the rightfulness of its existence and user under such authority would be legally binding on the state. In Ry. & Banking Co. v. Georgia, 92 U. S. 665, 23 L. Ed. 757, it was remarked:

"It may be that the consolidation of two corporations, or amalgamation, as it is called in England, if full and complete, may work a dissolution of them both, and its effect may be the creation of a new corporation. Whether such be the effect or not must depend upon the statute under which the consolidation takes place, and of the intention therein manifested."

The stockholders of the old companies became stockholders, it appears from the record, in like proportion of interest in the new company, and directors and officers thereof were elected, and the new corporation has been managed and regarded as such ever since. This practical construction of the purpose and object of the consolidation as being to create a new corporation and the right of user as such should be persuasive, at least in some degree, upon the proper construction to be given to the fact and intention of consolidation. And there is the further fact that the state, through its proper officers, has recognized the application of the act of 1889 to the consolidated International & Great Northern Railroad Company. It is not perceived why, under the terms of the agreement of the two companies in connection with special acts of the Legislature, the two original companies were not consolidated and merged "in property and franchises," one with the other, under the name of the International & Great Northern Railroad Company, which was to have continued existence as a new company with the enlarged powers, franchises, and property rights common to the original companies. As the effect of the completed consolidation, operating through the agreement of the companies and by the legislative authority mentioned, is that of creating a new corporation and of transmitting the franchise of each original corporation, with all its terms, to the new corporation, the new corporation would be possessed of the charter privileges common to both of the original companies. In virtue of this consolidation and merger the charter of the new company would then be regarded as if reading—

"that the principal office shall be established at Houston, Texas, or at such point on the line of said railway as may be deemed most convenient for the transaction of its business, and may be moved from time to time to such places on said line as the progress of the work of construction may render expedient and necessary."

Thus, as we believe would be the effect, the International & Great Northern Railroad Company, by the ambulatory terms of its charter, would have at the time of its existence no certain or fixed place designated for its principal office, and hence in that particular be within the terms of article 6423. The ruling in the case of Morrill v. Smith

County, 89 Tex. 529, 36 S. W. 57, is not opposed to that construction. In that case the bonds were issued to the original company on October 2, 1873, and the legal question involved was whether at the date of issue the obligee in the bonds was an existing corporation. As the opinion states the record, it did not appear at the date of issue of the bonds, either that a lawful consolidation was effected between the Houston & Great Northern Railroad Company and the International Railroad Company, or that the agreement to consolidate was then complete and had then taken effect between the two companies. At the date of the issue of the bonds to the original company the later two legislative acts of 1874 and 1875 and the completed consolidation had not, as here, happened.

[4] But if that construction be erroneous, the further terms of the same statute would afford another ground and would govern and control and, we think, be decisive. As a distinct and separate part of the act, it is provided in these words:

"And such railroads shall keep and maintain their machine shops and roundhouses, or either, at such place or places as they may have contracted to keep them for a valuable consideration received; and if said general offices and shops and roundhouses, or either, are located on the line of a railroad in a county which has aided said railroad by an issue of bonds in consideration of such location being made, then said location shall not be changed; and this shall apply as well to a railroad that may have been consolidated with another as to those which have maintained their original organization."

Intending, as the Legislature did, to establish a fixed locality for the general offices, shops, and roundhouses of a railway company, and prevent their being movable at the will of the company, the language of the act should be given that reasonable construction which would accomplish the purposes and intentions of the law. By expressly declaring, in the second paragraph of the article, that the principal offices shall not be changed from the locality where they "are located on the line of a railroad in a county which has aided said railroad by issuance of bonds in consideration of such location being made," it was evident that at the time the act went into effect the then place in which the offices were "located on the line," in consideration of a bond issue of such county, would be the only locality thereafter allowable to such railway company at which to fix and keep the same. This has the effect of qualifying and modifying the first paragraph of the article requiring the company to keep its offices at the place named in its charter. This construction makes consistent and gives force to all parts of the article in meaning to require railway companies to keep and maintain their offices at the place named in their charter; but if they "are located on the line" in consideration of county aid by bond issues, such companies shall not change them elsewhere, even to the original charter place. In this view the article in hand would be applicable, notwithstanding the Houston & Great Northern Railroad Company's legislative charter designated Houston as the place of principal office. Besides it expressly applies to consolidated companies.

[5] The further pertinent state of facts provided by the article in hand, in order to make the statute applicable, is that the "railroad company" shall have "contracted or agreed" to locate its general offices, shops, and roundhouses, "for a valuable consideration," or that such general offices, shops, and roundhouses "are located on the line" in a county which has aided the railroad by "an issue of bonds in consideration of such location being made." Speaking to the first state of facts mentioned, the terms of the act are to the extent only that there has been location made under "a contract or agreement for a valuable consideration." By requiring that the contract or agreement be that of the "railroad company," an unauthorized agreement or contract of officers of the company, unless adopted or ratified by the company, would not be sufficient. The case of Orient Ry. Co. v. City of Sweetwater, 104 Tex. 329, 137 S. W. 1117, ruled that as the contract made by the vice president was without authority or ratification, it could not be held that the "railroad company" made any contract. The case of Logue v. Railway Co. (Sup.) 167 S. W. 805, was one for damages; and, failing in proof of authority on the part of those making the contract to bind the company, the court held the company was not bound. Clearly in the two cases the contract of the vice president and contract with a single director of the company could not be regarded as the contract of the "railroad company," in the absence of authority or ratification. That is the extent of the ruling in the two cases.

[6] In the instant case, however, there are facts and circumstances sufficient to show authority on the part of the officers and that have the legal effect to make the contract or agreement of 1872 found by the jury the contract or agreement of the "company." The by-laws of the Houston & Great Northern Railroad Company throughout 1872 and 1873, according to sections 1 and 2 of article 1, and section 6 of article 2, vested the direction and management of the officers of the company in a board of nine directors, of whom a majority could transact business, and from whom could be elected a president, a chief engineer and general agent, a general superintendent, and other officers. The charter of that company empowered it "to make by-laws for its government," and vested the direction and control of its office in a board of directors. The only stated meetings of the board of directors were annual meetings. Under section 10 of article 2 the business of the company, during the intervals between the meetings of the board of directors, was to be transacted by the executive officers, with all contracts not of immediate necessity

to be subject to the approval of the board or executive committee. The executive committee consisted of five directors, a majority of whom could do business and was vested with all the powers of the board of directors during the intervals between its meetings, subject to ratification by the board, and the president was ex officio a member of the executive committee. The president, the chief engineer, general agent, and the superintendent were among the executive officers who were each authorized by the by-laws to transact the business of the company during the intervals between the meetings of the board and to make and close contracts of immediate necessity. Section 1 of article 3 provides that the president shall be the chief executive officer of the company, and shall have the general management and supervision of the officers of the company. Section 5 of article 3 confers on the president the power to negotiate contracts during the intervals between the meetings of the board, subject to approval by the board at its next meeting, save and except in cases specially provided for, and he shall perform such duties not otherwise provided for as are usually devolved upon the president of incorporated companies. By other sections the duty was devolved upon the president to execute all orders, as well as resolutions, of the board of directors in respect to the business of the company. Under article 3 the chief engineer and general agent was specially charged with the location and work of construction of the road, and in the absence of the president was the general supervisor of the affairs, officers, agents, and employés of the company. Under article 3 the superintendent had charge of running and operating the road, and of all employés engaged thereon, and was required to perform any other duties exacted by the president or board of directors. He was required to report to the board the expediency of any measures, changes, alterations, or improvements proposed to be adopted or made in the running or operation of the road, and to make monthly reports of his transactions to the board. The minutes of the Houston & Great Northern Railroad Company and the undisputed evidence show that for 1872 and 1873 Galusha A. Grow was president, and C. E. Noble was chief engineer and general agent, of the Houston & Great Northern Railroad Company, and that from December, 1871, to December, 1872, Grow was also superintendent of the company. On February 13, 1872, the board of directors of the Houston & Great Northern Railroad Company adopted an agreement between Grow for the Houston & Great Northern Railroad Company, and Dodge for the International Railroad Company, whereby the two companies were to be consolidated, all of which was approved by the stockholders of the companies on September 23, 1873. On February 14, 1872, which was the day following the decision to consolidate, the board of directors of the Houston & Great Northern Railroad Company adopted this resolution:

"Resolved, that the President be instructed to proceed with the work of extending the road, provided counties make satisfactory subscriptions."

On March 15, 1872, Grow, acting under the authority of the by-laws, and acting with the assistance of Chief Engineer and General Agent Noble, made and entered into the contract with the citizens of Palestine whereby, in return for Judge Reagan's obligation to canvass Anderson county and a bond issue of $150,000, the Houston & Great Northern Railroad Company became obligated to connect its railroad with the International at Palestine, and as a part of said railroad to locate and keep general offices, machine shops, and roundhouses at Palestine. On March 26, 1872, the orders were issued for the election to authorize Anderson county's bond subscription, and Judge Reagan advised the president of the International Railroad Company that the donation would most likely be voted. On March 28, 1872, which was probably the day following the receipt of the assurance of Judge Reagan, the contract was let for the extension of the Houston & Great Northern Railroad to intersect the International at Palestine. On April 28, 1872, Grow made a public speech to hundreds of people, openly publishing the locative contract made by the Houston & Great Northern Railroad Company with the citizens of Palestine. Early in 1872 the subscription in Anderson county bonds was voted by the electors, and the result was declared, and before the close of the month the International Railroad Company, then being operated as one in interest with the Houston & Great Northern Railroad Company, caused a survey and map of its lands in the city of Palestine to be made, showing a reservation of 87.10 acres in the city, adjacent to the principal business street, for railroad purposes, on which machine shops, roundhouses, and general offices were afterwards located and maintained, with the balance of the company's lands. The map is indorsed "Office of Chief Engineer and Superintendent of Construction, International Railroad, Hearne, June, 1872." On January 11, 1873, the Houston & Great Northern Railroad Company adopted the resolution:

"Resolved, that President Galusha A. Grow is hereby authorized to receive from Anderson county, or any other county having donated bonds to this company, the bonds donated in aid of the building of the road, and to receipt for the same."

On January 29, 1873, Grow presented to the county court of Anderson county the Houston & Great Northern Railroad Company's written application for the bonds, and publicly declared in open court to the effect that the contract for the location at Palestine of the shops and offices was common knowledge. The bonds of Anderson county having been delivered on January 29, 1873, the executive committee of the Houston &

Great Northern Railroad Company on February 4, 1873, adopted the resolution authorizing the payment of a 'draft "of Galusha A. Grow, president Houston & Great Northern Railroad 'Company and International & Great Northern Railroad Company," which was to be credited "for extra services and expenses in procuring donations of lands and county bonds to the International and the Houston & Great Northern Railroad Companies." On July 21, 1874, is an entry on the minutes of the board of directors of the Houston & Great Northern Railroad Company:

"On motion resolved, that the President be granted $5,000.00 in addition to the amounts authorized by resolution of February 4 and December 3, 1873, and April 7, 1874, which amount is in full payment for extra services and expenses as provided in the original resolution of February 4, 1873."

On February 13, 1873, within two weeks from the delivery of the bonds of Anderson county, Grow, as president of the International & Great Northern Railroad Company, approved the recommendation of the auditor to the secretary of the company for the immediate removal of consolidated general offices to Palestine. It is undisputed that the general offices at Houston were abandoned about July 1, 1875. On that date the board of directors adopted the following:

"Resolved, that the general office of this company be moved to Palestine in Anderson county, Tex., as soon as practicable, and that it be the duty of the secretary to give timely notice of such removal in the Houston Daily Telegram and the Galveston Daily News."

About four months before the removal General Superintendent Hoxie requested an interview with the citizens of Palestine, at which, in the presence of Vice President Hayes, and with his assent, Hoxie offered, on behalf of the International & Great Northern Railroad Company, to completely perform the Reagan-Grow contract or agreement by removing the general offices from Houston and by keeping the offices, shops, and roundhouses at Palestine, provided houses were built at once by the citizens at their own expense for the general officers, their families and clerks, as directed by the company. The offer was accepted the day it was made, and the houses were built by about the middle of June, and as fast as they were completed the company put men into them. The by-laws of the International & Great Northern Railroad Company in force in 1875 conferred the same power and authority on the president and general superintendent of that company as conferred by the by-laws of the Houston & Great Northern Railroad Company. It was proven that throughout the year 1875 Hayes was vice president and general manager of the International & Great Northern Railroad Company. Sloan, the president, resided in New York, and did not perform any practical duties in Texas while he was president. The board of directors on July 21, 1874, expressly conferred the authority, which Hayes exercised:

"Resolved, that the general manager be authorized to perform the duties of the president in Texas in his absence."

It is quite unnecessary to further set out every detail, for we conclude there is in the record conclusive circumstantial evidence that the board of directors of the Houston & Great Northern Railroad 'Company and the International & Great Northern Railroad Company knew of and approved the locative contract.

By the act of December 19, 1857, there was conferred upon every railroad company the power "to make such by-laws as might be thought proper for the government of the company." Similar power was by its charter conferred upon the International Railroad Company. Treating the by-laws shown in the record as a valid source of the officers' authority to bind the company and as expressing a permanent and continuing rule for the government of the company, then both of the contracts alleged were duly authorized by undisputed evidence.

"Intrusting the president with the management of the entire business is not the delegation of corporate powers and rights, but is a mere authorization of the president to perform for and in the name of the corporation the business it is authorized to transact." 1 Thompson on Corp. § 1200; 2 Thompson on Corp. §§ 1409, 1465.

Added to this authority was the resolution of February 14, 1872, instructing the president to proceed with the work of extending the road and of securing donations of county bonds. The contract of March, 1872, with the citizens of Palestine, was a contract for the extension of the road, and was a contract to secure county bonds. The terms of the contract on both sides were left by the resolution to the discretion of President Grow. Hence there would appear, not only the contract of 1872 authorized by the by-laws and directed by the board of directors of both the Houston & Great Northern Railroad Company and the International & Great Northern Railroad Company, but the express promise of the latter company to perform the contract. And even if it should be asserted that there is no direct evidence that the particular contracts were actually placed before the full board of directors, the presumption would obtain that the officers of the company did as their duty required them to do. Olcott v. Gabert, 86 Tex. at page 126, 23 S. W. 985. Hence the presumption would charge the board with full knowledge of the terms of the contract, as found by the jury they did have. In the case of City of Tyler v. Railway Co., supra, the record showed no by-laws, and showed no precedent resolution of the board of directors, but it did show, as does this record, an express offer to perform a prior contract, together with certain acts by the railroad company involving sanction by the board of directors, which at the time and in the manner carried out authorized the finding that

the same were done in performance of the contract. Therefore in giving the proper legal effect to the state of facts found by the jury, which we must take as true, it would certainly appear that the terms of the article have application to appellant's predecessor. And it would further appear as a fact that, at the time the act of 1889 took effect, the offices, shops, and roundhouses were located at Palestine as one of the considerations for a bond issue of Anderson county for $150,000. It is insisted, though, by appellant that, as the law required the records of the county court of Anderson county to state a proposal or consideration for which the bonds of the county were to issue, such record would be conclusive of the consideration, and no parol, outside considerations, inducements, or promises can be gone into.

[7, 8] By the law authorizing a county to aid in the construction of a railroad or make internal improvements, the requisite of submission to a popular vote is that the order of the court for the election shall be entered on the minutes, and "shall also state in clear and concise language whether the proposition be to take stock, to make a loan, or to make a donation, and the amount of aid to be given and the particular road or work for which it is to be used." And upon favorable result of the election the court must, according to the act, "make such orders and adopt such regulations as will give practical effect to the proposition so voted for." Acts 1871, p. 29; Paschal's Digest, art. 7329. Clearly the extent of the language of the act, in requiring what the order shall state, is as to the character of the aid to be given and the amount thereof. The act does not require that the order of the court shall state all the terms and stipulations which the agents of the county and the railway company have seen fit to agree upon, either as to the work or extent of construction to be done. And while the act provides that the work for which the donation is made shall be completed at the time of issue, there are no express limitations or conditions upon making independent specific stipulations, as the parties may deem proper, to the extent of the work of construction that should be completed. The aid is clearly authorized for the benefit of public use, and particularly for the interests of the county. The "construction" of a railway might properly include the location of offices, shops, and roundhouses.

[9] In Railway Co. v. Attica, 56 Ind. 486, in passing upon a statute, like the one here, authorizing municipal corporations to extend aid in the construction of railroads in two ways—either by subscribing to the stock of the company or by making a donation thereto—it was decided that the term "donation" meant an absolute gift, without any condition or consideration. Fisk v. Flores, 43 Tex. at page 344, though, determines that:

"It is also quite evident that it is entirely consistent with the nature of a title by 'donation' that the donor may be moved, by reason of services rendered by the donee, to make the donation, and that it is induced by such consideration does not take from the transaction the character of 'a donation.'"

[10] The parties having the right, as we think they did, to stipulate, by reason of the donation, as to the extent of the work or construction that the railway shall have completed at the time of the donation or issue, and the terms of such contract not being required by statute to be in writing or stated in the minutes of the court, the extent of the work as the "consideration" or agreed inducement for the donation may be truly shown, as permitted generally in ordinary cases. The case of Anderson County v. Railway Co., 52 Tex. 228, does not hold that the order of the county court was required by law to state the terms of stipulation and the consideration for the issue of the bonds. In that case the plaintiff by its petition sought to have the bonds canceled because, among other grounds, there was failure to build a depot; and the court held it must be conclusively presumed that feature of the agreement was performed because the authorized agent of the county had within his authority so declared, and, further, that:

"An allegation of a partial failure of the railroad in its contract shows no sufficient reason for annulling the entire issue of bonds, or for the recovery of the value of the entire issue."

Here the first contract or agreement alleged was formed about March 15, 1872. It arose from the verbal acceptance of a verbal offer. The offer was made by Mr. Grow, acting for the Houston & Great Northern Railroad Company, to the citizens of Palestine, represented by Judge Reagan, and the terms accepted by Judge Reagan for such citizens. When these terms submitted in parol were assented to in parol, the contractual tie existed. It was not intended by either party that any memorial should be made in writing of the terms and considerations of the contract entered into by Grow and Reagan as the agents of their respective principals. The order of the court was only a requisite to the extent of part performance of the contract in order to carry out one of its terms. The parol evidence rule would therefore have no application to a contract or agreement entirely verbal, as here, even though it may be necessary to perform some obligation of the contract by means of a written memorial. 17 Cyc. 741; 1 Greenleaf on Ev. § 305e. Following this rule: Hansen v. Yturria, 48 S. W. 797; Peel v. Giesen, 21 Tex. Civ. App. 334, 51 S. W. 44; Landrum v. Stewart, 111 S. W. 770. The alleged second contract of 1875 rested entirely in parol.

[11] It is further contended by appellant that the foreclosure sale in 1879 had the legal effect to wipe out the contractual obligation of the International & Great Northern Railroad Company in respect to location of its offices, shops, and roundhouses. Appellant pleaded that on October 14, 1879, the

properties and franchises of the International & Great Northern Railroad Company were discharged from contract obligations by virtue of judicial sale under decree of foreclosure to John S. Kennedy and Samuel Sloan as trustees, who on November 1, 1879, conveyed the properties and franchises unto the International & Great Northern Railroad Company for $10,348,000 in purchase-money bonds. The appellees in replication to this defense pleaded that if John S. Kennedy and Samuel Sloan purchased said properties and franchises, they did so as trustees for the International & Great Northern Railroad Company and for its stockholders at the date of purchase, in consummation of an agreement between all parties at interest that such sale should not affect the stock ownership in said company nor the company's title to said properties and franchises. Under these pleadings the question of a bona fide sale to any third person became issuable. The facts and circumstances warrant the inference of fact, which in support of the court's judgment we must assume that the court made, that there was not a bona fide judicial sale. Hence in such finding of fact the legal effect of the sale and deeds to the trustees would not discharge admitted corporate obligations. Northern Pac. R. Co. v. Boyd, 228 U. S. 482, 33 Sup. Ct. 554, 57 L. Ed. 941.

[12] Concluding, as we do, that in point of fact and law article 6423 applied to the appellant's predecessor, and that such article would govern appellant, the question raised of venue in Anderson county must be overruled for the reasons given in Anderson County v. Ry. Co., supra, that the question of venue was dependent upon the ultimate fact of the legal location of the principal office or domicile. This ruling disposes of as well the assignments raising the plea of res adjudicata, the validity of the alleged contracts, statutes of limitation and fraud, and admissibility of evidence.

[13] It is further our opinion that the plea to the jurisdiction of the district court of the state, as made by appellant, was properly overruled by the court. Clearly the federal court had the power to reserve jurisdiction to determine the validity and priorities of any liens and burdens against the sold-out properties of the International & Great Northern Railroad Company in the hands of the purchaser or his assign, and its jurisdiction in that respect would be certainly exclusive. But the appellees by their suit are not seeking, in the nature of a private or personal right, to subject the property to any burden, lien, claim, or right growing out of or attached to the acts of the sold-out company. Nor is the effect of appellees' suit to hold or subject the purchaser of the sold-out company in liability in his property to a personal or private claim or incumbrance in favor of appellees, by reason of any contract or liability incurred by the sold-out company.

Properly construing the appellees' petition in the light of the facts given therein, and the prayer, the suit was in the nature of the prevention of the continuance of an illegal act, violation of a statute of the state, upon appellant's part, working injury without remedy at law and seeking to interrupt the continuance of such wrong by equitable interference at the hands of the court. Upon the facts stated in the petition as offered therein, in showing a violation of statute law by the appellant, the prayer was for a decree—

"for a mandatory injunction, commanding the defendant to at once desist and refrain from keeping or maintaining any other general offices in connection with the operation of said railroad at any other place than the city of Palestine, and commanding and requiring the defendant to keep and maintain all of the general offices for the operation of said railroad at the city of Palestine."

If enforced according to the terms of the prayer, clearly the results of the suit belong to and inure to the public, as a duty owing to it. The defense of appellant and the right of appellees were entirely dependent upon whether a statutory provision of the state in respect to charter rights of appellant in location of its domicile was applicatory. The decree was entirely dependent upon the statute, and not the enforcement of a private contract as such, for its vitality. The contract was only evidence in the line of facts going to prove the application of the statute, and did not operate or have the legal effect to create a lien in rem, or any other legal liability or claim in favor of appellees. As the federal court had finally dismissed the proceedings from the docket, the jurisdiction existed in the state court to grant the equitable relief here sought against appellant, and such jurisdiction does not in the least interfere with or conflict with the decree of the federal court. This ruling in respect to the nature of the petition will serve also to overrule assignments presenting demurrers and exceptions to same.

Appellant assails the articles of the Legislature being considered, originating as the act of 1889, as violative of the Constitution of the United States in the several articles mentioned in the ruling. It is believed that the act could not properly be construed as undertaking to add to pre-existing contracts rights of a purely private character and to be enforceable as such. When a railway company bargains away for a valuable consideration the domicile of origin, the effect is more than a mere personal contract. It is a modification of the corporate franchise, and to that extent relinquishes and limits the charter obligation or privilege. The avowed purpose of the act was to be applicable to such situations and companies. Prior to the Constitution of Texas of 1876 all railway companies were chartered by special legislative acts. Before the passage of the act of 1889 such railway companies having legislative charters were required, by general acts of 1853 amend-

ed by general act of 1857, to keep their principal offices at the place named in the charter, but were further expressly authorized thereby to change same at pleasure to some other point on the line of the railway. Manifestly the language of the act of 1889 expresses the purposes and intention of the Legislature to have only certainty of the location of the principal offices, shops, and roundhouses, and to insist upon the domicile chosen by any railway company as suitable to it being final and unchangeable. In this view, as an amendment of the acts of 1853 and 1857, the legislation of 1889 is not an onerous amendment, nor does it either essentially alter the plan of corporation or fundamentally change any privilege in holding, as it does, the governing offices at the chosen domicile of the company when there has been permanent relinquishment and abandonment in point of fact of the domicile of origin.

[14] Such being the principle involved in the law, and as it operates, and purports to operate, no further than that principle, it is believed that under the facts clearly established by this record there does not arise, nor is there presented, any question of constitutional violation of appellant's rights in any respect, or impairment of obligation of charter contract. Under the findings of fact here the consolidated International & Great Northern Railroad Company, appellant's predecessor, changed the location of its governing offices, shops, and roundhouses, to Palestine, under locative contracts, for a valuable consideration and aid by bonds. It is evident from the terms of the locative contract, and is adduced as a fact, that such company intended to permanently relinquish and abandon its domicile at Houston without intention of return.

[15, 16] It is a general rule of evidence that the acts of a party are admissible evidence of such party's intention to establish a domicile. And a domicile, once existing, is presumed to be retained until shown otherwise. So contracted locations, as here, abided with intention of permanency, as here, would be acts evidencing the purpose to permanently relinquish and abandon the place designated in the charter, and have only the chosen domicile. It was proven that the International & Great Northern Railroad Company has had its domicile at Palestine, asserting that point as its place of principal office for about 40 years, and to its dissolution by foreclosure proceedings. And since the act of 1889 went into effect to the day of being sold out by judicial decree, being about 23 years, the International & Great Northern Railroad Company asserted and claimed its chosen domicile at Palestine as the place of its principal office, and at which place its shops and roundhouses were located. Having permanently relinquished and abandoned in point of fact the domicile of origin at Houston for a chosen domicile at Palestine, and without intention of return to Houston, neither the International & Great Northern Railroad Company, nor appellant for it, could consistently insist that a state of facts exists showing injury or destruction of any original contract term of having domicile at Houston. And in view of the fact of permanent abandonment, as was the effect of the locative contract, the repeal of the act of 1857 by the act of 1889 would not so far bear upon appellant's predecessor as to operate to impair any of its existing rights claimed or asserted to the time it was sold out. And even if the act of 1889 operated to amend the term of privilege to go "elsewhere on the line of road at pleasure," it would appear, as a fact warranted by the evidence, that the company as such sanctioned and agreed to the modification thereof by the general act of 1889. Knowing of the modification of the right to railway companies to go elsewhere at pleasure, as was the effect of the act of 1889, the stockholders of the International & Great Northern Railroad Company, after the passage of the act, met at Palestine annually for 23 years, and to the judicial sale, claiming and asserting such chosen domicile as the "principal office." Upon the idea that the act of 1889 operated to change or restrict the obligation to go freely elsewhere at pleasure, it would appear as a fact, deducible from the evidence, that such stockholders acquiesced in and consented to the change or restriction of the former privilege or term of contract. Knowing of the legislative provision and its application to the International & Great Northern Railroad Company, as it must be presumed that the stockholders did, it is apparent from their acts, claims, and conduct in reference to the chosen domicile of Palestine that they as owners undertook to perform the requirement of the law and accept the chosen domicile of Palestine as final and unchangeable. It was thought in Com. v. Cullen, 13 Pa. 133, 53 Am. Dec. 450, where a new grant is beneficial in its aspects very little is required to found the presumption of acceptance. It is not doubted that corporations can, like individuals, agree to and accept modification of terms of obligation. In Williams v. Wingo, 177 U. S. 60, 20 Sup. Ct. 793, 44 L. Ed. 905, it was held, in effect, that a general statute may be repealed because it does not constitute a contract as such with any particular person or company. Therefore, in the facts of the case, it is believed a constitutional question does not arise having application to appellant or its predecessor. While adhering to the conclusion that the facts of the record afford no ground for holding that any existing rights of appellant or of its predecessor have been invaded or violated, it is nevertheless believed that the act of 1889 is in all respects valid and subject to no constitutional objections, as a police regulation within the power of the state to make.

[17, 18] It is an established rule that a corporation is a resident citizen of the state in which it is created, and must dwell within the state of its creation. Bank v. Earle, 13 Pet. (U. S.) 519, 10 L. Ed. 274. And the state, having the power to create the corporation, has the right, it is not doubted, to fix by initial legislation the precise locality within the state for the location of the governing offices of the corporation. If the state has the power, as it has, to fix the location of the governing offices in the first instance, it rests upon the ground of public interest in that respect. The location of governing offices of a corporation is a subject-matter of public interest and regulation for purposes of jurisdiction, litigation affecting the corporation as such, state visitation, and taxation of personal property. And in the absence of legislation conclusively fixing the principal office of the corporation, the place where it has such principal office would lie entirely in matter of proof. As well is the location of principal shops and roundhouses on the line of road a subject-matter of public interest, for they are but a part of the physical instrumentalities of necessary operation of the railway, and the public are affected in interest through proper operation of the road as a public carrier. Moreover, as the shops and roundhouses are a necessary part of the operation of the railway, the location of the same at the will of the company would not be an absolute right to it, freed from legislative regulation in public interest and convenience. The company may not, as a right, establish its shops and roundhouses at a point either without the state or off of and distant from its line of railway, because, conferring, as the state does, the right to the company of operation of the road through a given territory, and only a given route within the state, the company in so doing would be acting beyond a territorial privilege of operation. The power of the state to restrict the privilege of operation of the road to the particular territory or route authorized to be covered would necessarily include the right, exercised in public interest and convenience of operation, of enforcing location at a particular point on the line of road of the given instrumentalities of operation.

[19, 20] If the power exists in the state, as it does, to regulate and reasonably govern operation of the road in public interest and convenience, the necessity or expediency and economic reasons for so doing are purely questions for the Legislature, and not for the courts. The location of the principal office, shops and roundhouses being a subject-matter of public interest, legislation in respect thereto would be within the police power of the state to promote public convenience or good. The police power of the state extends, reasonably exercised, to promote the public convenience. Railway Co. v. Ill., 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175; Railway Co. v. Ohio, 173 U. S. 292, 19 Sup. Ct. 465, 43 L. Ed. 704; Ins. Co. v. Ohio, 153 U. S. 446, 18 Sup. Ct. 868, 38 L. Ed. 780. And location of the principal office being within the police power of the state, previous regulation would not prevent the operation of the police power, further exercised, to promote the public convenience or good. In application of that principle the state, in Railway Co. v. Kentucky, 161 U. S. 677, 16 Sup. Ct. 714, 40 L. Ed. 849, was held to have the power to forbid the consolidation of competing corporations, though the right to consolidate should be held to be given by the charter, and though the charter contained no reservation of power so to do. To the same effect is Pearsall v. Railway Co., 161 U. S. 646, 16 Sup. Ct. 705, 40 L. Ed. 838. It was held in State v. Railway Co., 24 Tex. 122, that it was within the constitutional power of the state to impose the duty upon executive officers of the company to reside within the state, though the law was passed after the grant of the charter. The principle of law of this latter case has direct application to the instant legislative provision. A difference in principle is not perceived to be between requiring the president and a majority of the directors to have residence within the state and requiring the governing officers of the corporation to have residence in a particular locality within the state on the line of railway. A legislative provision, requiring location of general offices at a fixed locality, in its last analysis means only that the executive and governing officers of the corporation as such shall have residence at a particular locality within the state on its line of railway. The same principle would have application to shops and roundhouses, which are but a part of the instrumentalities of operation of the railway. Holding, as we do, that the act is a regulatory one in public interest and within the operation of the police powers of the state, it is not therefore assailable as violative of the federal Constitution upon the ground of impairing the obligation of charter contract.

[21, 22] Appellant, though further claims that the statute denies equal protection of the law because of classification, in that it does not include individuals and receivers operating a railroad as carriers. It applies to all railroad corporations alike. Railway Co. v. Mackey, 127 U. S. 205, 8 Sup. Ct. 1161, 32 L. Ed. 107; Tullis v. Railway Co., 175 U. S. 348, 20 Sup. Ct. 136, 44 L. Ed. 192; Railway Co. v. Mathews, 165 U. S. 1, 17 Sup. Ct. 243, 41 L. Ed. 611. And appellant further claims that the act is in denial of equal protection of the law because it imposes excessive penalties that preclude an appeal to the courts against its provisions. The penalty provision of this act being severable, and no penalties being here inflicted, that portion of the act is of immaterial consideration. Railway Co. v. Michigan R. R. Com., 231 U. S. 457,

34 Sup. Ct. 153, 58 L. Ed. 310; Railway Co. v. Garrett, 231 U. S. 298, 34 Sup. Ct. 48, 58 L. Ed. 229.

[23] The act is not retroactive, as insisted by appellant, against it, for its charter bears date since the act was passed.

[24] It is further insisted that the act is void as direct regulation of interstate commerce. Undertaking, as the act does, only to make the subject of a local law the domicile of a corporation created by it, it could not reasonably be determined that the act attempts to regulate, or is a per se regulation, of interstate commerce. Consequently it is not an objection to the act that it may remotely affect, if it does, interstate commerce. Railway Co. v. Hughes, 193 U. S. 488, 24 Sup. Ct. 132, 48 L. Ed. 272; Railway Co. v. Mazursky, 216 U. S. 132, 70 Sup. Ct. 878, 54 L. Ed. 417; Smith v. Alabama, 124 U. S. 465, 8 Sup. Ct. 564, 31 L. Ed. 511.

We have carefully considered all the assignments made in the brief, and have concluded that they should be overruled.

The decision of the questions made on appeal has the result to affirm the decree of the trial court restraining appellant from changing the location of its general offices, shops, and roundhouses from the city of Palestine, and from keeping and maintaining its general offices at any other place than Palestine, Tex., unless hereafter authorized by law so to do.

### Supplemental Opinion.

Appellant prior to its motion for rehearing has filed a motion suggesting the disqualification of two members of this court and asking to have the judgment and opinion of this court vacated by reason of the suggested disqualification. It is suggested that the two members are related within the third degree to certain resident citizens and property owners of the city of Palestine. It is agreed as a fact by counsel that W. M. David and his wife are now and have been for about seven years resident citizens of the city of Palestine, owning a limited amount of personalty, and that W. M. David is a first cousin of Chief Justice Willson. It is agreed as a fact by counsel that A. G. Greenwood, T. B. Greenwood, and Miss Mattie Greenwood are now, and have been for more than 10 years, resident citizens of the city of Palestine, owning a considerable amount of taxable personal and real property, and that they are related by consanguinity within the third degree to Associate Justice Hodges. There are two further exhibits attached to the motion pertaining to the occupation and financial worth of the relatives. This court accepts the agreement and the exhibits as the facts, and further admits as a fact the relationships stated. These citizens of Palestine were not among the nine named citizens by whom the suit was brought, nor are they in point of fact parties to the record or the suit. The suit was brought by Anderson county, the city of Palestine, George A. Wright, and eight other "citizens of the city of Palestine, Tex., who sue herein in behalf of themselves and of all other citizens of said city of Palestine." The suit had for its purpose to compel the defendant, as a duty owing the public under the law, to keep and maintain its general offices, machine shops and roundhouses in the city of Palestine, and to desist and refrain from keeping and maintaining any other general offices in connection with the operation of the railroad than at Palestine, Tex. The appellee's petition and the decree of the trial court are made a part of this statement and can be referred to.

The following are petition and decree of the trial court, made a part of the statement in the opinion rendered by the Court of Civ. Appeals of the Sixth Supreme Judicial District of Texas:

First Amended Petition, Filed January 7, 1914.

The State of Texas, County of Cherokee.

In District Court, November Term, 1913.

To the Honorable Judge of the District Court of Cherokee County, Texas:

The first amended original petition of Anderson county, and of the city of Palestine, and of Geo. A. Wright, J. W. Ozment, A. L. Bowers, Jno. R. Hearne, Z. L. Robinson, E. W. Link, R. C. Sewell, Jno. M. Colley, and P. H. Hughes, citizens of the city of Palestine, Tex., who sue herein in behalf of themselves and of all other citizens of said city of Palestine, styled herein plaintiffs, amending their original petition filed on the 7th day of February, 1912, leave of the court first being had, complaining of the International & Great Northern Railway Company, styled herein defendant, would respectfully show to the court:

(1) That Anderson county is, and has been since prior to the 1st day of March, 1872, a body corporate and politic, created and organized as a county by the Legislature of the state of Texas.

(2) That the city of Palestine is a municipal corporation, duly incorporated and chartered as a city of over 10,000 inhabitants by special act of the Legislature of Texas, approved on the 19th day of March, 1909, and is the successor of the city of Palestine, duly incorporated under the laws of Texas as a municipal corporation, since prior to the 1st day of March, 1872.

(3) That each of the plaintiffs, Geo. A. Wright, J. W. Ozment, A. L. Bowers, Jno. R. Hearne, Z. L. Robinson, E. W. Link, R. C. Sewell, Jno. M. Colley and P. H. Hughes, resides in the city of Palestine, in the county of Anderson, and state of Texas, and each of them is a citizen of said city and the owner of real and personal property in said city. That each of the last-named plaintiffs has resided in said city of Palestine, and has been the owner of real and personal property therein since long prior to the 1st day of September, 1911; and the plaintiffs Geo. A. Wright, J. W. Ozment, and E. W. Link have been such resident citizens and property owners since prior to the 1st day of March, 1872.

(4) That the citizens of the city of Palestine are numerous, aggregating in number some 12,000, and they have a joint and common interest in having the general offices, machine shops and roundhouses of the International & Great Northern Railroad kept and maintained, by the defendant, at Palestine. That it

is impracticable to make all of said citizens parties to this suit, in their own proper persons, and hence this suit is brought by the individually named plaintiffs, in behalf of each and all other citizens of said city, as well as in behalf of themselves.

(5) That the defendant, International & Great Northern Railway Company, is a corporation, organized under the laws of Texas as hereinafter shown, and required by law to keep and maintain its general offices at the city of Palestine, in the county of Anderson, Tex.

(6) That on the 22d day of October, 1866, the Legislature of Texas, by an act entitled "An act to incorporate the Houston & Great Northern Railroad Company," created and chartered that company, and authorized it to construct, own, maintain, and operate a railroad, commencing at the city of Houston and running northward to Red river. That said act authorized said company to form a junction and connection with any other road in such manner as would best secure their construction.

(7) That on the 5th day of August, 1870, the Legislature of Texas, by an act entitled "An act to incorporate the International Railroad Company and provide for the aid of the state of Texas in construction of same" created and chartered that company, and authorized it to construct, own, maintain, and operate a railroad from such point on Red river as nearly opposite to the town of Fulton, in the state of Arkansas, as might be found expedient in forming a junction with the railway known as the "Cairo & Fulton Railway," then being constructed, by the most practicable route across the state of Texas, by way of Austin and San Antonio, to the Rio Grande river, at such point at or near Laredo as might be selected by the company. That said act authorized the International Railroad Company to connect itself with any other railroad company, within or without the state, and to operate and maintain its railroad in connection or in consolidation with any other railroad company, as it might deem best; and said act provided that the principal office of said company should be established at such point on the line of said railroad as might be deemed most convenient for the transaction of its business, and might be moved from time to time to such places on the line as the progress of the work of construction might render expedient or necessary.

(8) That, acting under said act of August 5, 1870, the International Railroad Company had, prior to the 15th day of March, 1872, constructed a portion of its line of railroad from, at, or near the town of Hearne, in Robertson county, Tex., to the city of Palestine, in Anderson county, Tex., and was regularly operating said line of railroad, as a common carrier of freight and passengers for hire, and was maintaining a depot at said city of Palestine.

(9) That heretofore, to wit, on or about the 15th day of March, 1872, the Houston & Great Northern Railroad Company had constructed, or had determined to construct, under its charter, its line of railroad from the city of Houston northward to the north boundary line of Houston county, Tex.; and, on or about said date, said Houston & Great Northern Railroad Company, acting by its duly authorized president, Galusha A. Grow, contracted and agreed, in Anderson county, Tex., with the citizens of the city of Palestine, Tex., acting by and through Judge John H. Reagan, to extend its said line of railroad from the north boundary line of Houston county, to intersect the line of the International Railroad Company at Palestine, and to establish a depot within one-half mile of the courthouse at Palestine, and to commence running cars regularly thereto by the 1st day of July, 1873, and to thereupon locate and establish, and forever thereafter keep and maintain, the general offices, machine shops, and roundhouses of the Houston & Great Northern Railroad at the city of Palestine, for and in consideration of the promise and agreement then made, upon the part of the said Judge John H. Reagan, to make a thorough canvass of Anderson county, to induce the electors thereof to authorize, by their votes, the issuance of the interest-bearing bonds of said county in the principal sum of $150,000, and, for and upon the further consideration that Anderson county, on authorization of its electors, in the manner prescribed by law, should issue and deliver to the Houston & Great Northern Railroad Company its interest-bearing bonds in said principal sum of $150,-000, upon the completion of said railroad to its intersection with the International Railroad at Palestine, and upon the establishment of a depot within a half mile of the courthouse, and upon the commencement of the running of cars regularly to such depot.

(10) That if said contract did not expressly name the citizens of Palestine as parties thereto (as plaintiffs expressly aver it did), yet the same was made for their benefit and in their behalf, and such citizens, at that time and throughout the future, including the plaintiffs, were the parties intended, by both Judge John H. Reagan and the Houston & Great Northern Railroad Company, as the parties to be benefited by the performance of all the obligations of the railroad company under said contract, and especially of those obligations which related to the location and maintenance of general offices, machine shops and roundhouses at Palestine.

(11) That the above-mentioned contract, and especially the promise to establish and forever maintain said general offices, machine shops, and roundhouses at Palestine, was made and entered into by the Houston & Great Northern Railroad Company as an inducement to Anderson county and the electors thereof to donate to said Houston & Great Northern Railroad Company the bonds of said county in the principal sum of $150,000, and it was in reliance upon, and in consideration of, such inducement, contract, and promise that said bonds were subsequently authorized and delivered to said railroad company.

(12) That in order to induce the electors of Anderson county to authorize the issuance and delivery to the Houston & Great Northern Railroad Company of the interest-bearing bonds of Anderson county, in the principal sum of $150,000, which bonds are hereinafter more fully described, the Houston & Great Northern Railroad Company, acting by its duly authorized president, Galusha A. Grow, and by other duly authorized agents, on or about the 15th day of March, 1872, and on or about the last days of April, 1872, and on or about the first days of May, 1872, and throughout the time from about the 15th day of March, 1872, to the 4th day of May, 1872, promised, agreed, and represented, unto and with Anderson county, and the electors thereof, that the general offices, machine shops, and roundhouses of the Houston & Great Northern Railroad, upon the completion of said railroad to Palestine, would be established and forever thereafter maintained at Palestine, in Anderson county, Tex., and, further, that said company was firmly bound by valid contract with the citizens of Palestine to so establish and maintain said general offices, machine shops, and roundhouses.

(13) That said contract, promises, agreements, and representations were deliberately authorized and made by the Houston & Great Northern Railroad Company with the intention that the electors of Anderson county should act and rely upon same. That the electors of Anderson county were induced, by said contract, promises, agreements, and representations, to authorize and therefore did authorize, by their votes, at an election held in said coun-

ty on the 1st, 2d, 3d, and 4th days of May, 1872, the issuance and delivery to the Houston & Great Northern Railroad Company of the interest-bearing bonds of Anderson county, for the principal sum of $150,000, payable in 20 years from their date, with interest at the rate of 8 per cent. per annum from their date, as per coupons to be attached, the interest and 2 per cent. of the principal to be paid on the 1st day of January of each year, said bonds to be issued and delivered upon the completion of said railroad to an intersection with the International Railroad at Palestine, and upon the establishment of a depot within a half mile of the courthouse at Palestine, and upon the commencement of the regular running of cars by said company to such depot. That said electors would not have authorized the issuance and delivery of said bonds, nor the offer of same to the Houston & Great Northern Railroad Company, but for the inducement of the above-mentioned contract, promises, agreements, and representations by the company that it would establish and forever maintain general offices, machine shops, and roundhouses at Palestine, and that it was under a binding contract with the citizens of Palestine so to do, nor but for the fact that the electors relied and acted upon such contract, promises, agreements, and representations.

(14) That the said Judge John H. Reagan made a thorough canvass of Anderson county between about the 15th day of March, 1872, and the 4th day of May, 1872, to induce the electors of Anderson county to vote to authorize the issuance of said bonds, in strict conformity with his promise 'to, and agreement with, the Houston & Great Northern Railroad Company and its president, as hereinbefore alleged.

(15) That said election was held under and by virtue of a proper order of the commissioners' court of Anderson county, Tex., and subsequently, on the 6th day of May, 1872, an order was entered in said court declaring that more than two-thirds of the qualified voters of Anderson county had voted in favor of the issuance of said bonds.

(16) That prior to the 31st day of December, 1872, the Houston & Great Northern Railroad Company completed its railroad from the north boundary of Houston county to its intersection with the International Railroad at Palestine, and built a depot within one-half mile of the courthouse at Palestine, and commenced to run its cars regularly thereto, and thereafter, on or about the 29th day of January, 1873, said company, by its president, Galusha A. Grow, applied to the commissioners' court of Anderson county for the interest-bearing bonds of said county in the principal sum of $150,000, as hereinbefore described and as authorized by the electors of said county; and in order to induce the commissioners' court of Anderson county to issue and deliver said bonds, the said Houston & Great Northern Railroad Company, acting by its duly authorized president, Galusha A. Grow, again promised, agreed, and represented unto said county and said commissioners' court that the company had already begun to establish and would thereafter forever maintain its general offices, machine shops, and roundhouses at Palestine, as required by its contract with the citizens of Palestine; and, acting on said promise, agreement and representation, and relying on same, as well as on the previous contract, promises, agreements, and representations of said company, as hereinbefore set out, and in part performance of said contract between the Houston & Great Northern Railroad Company and the citizens of Palestine, the said commissioners' court was induced to issue and deliver, and on or about the 29th day of January, 1873, did issue and deliver, unto the Houston & Great Northern

Railroad Company the interest-bearing bonds of Anderson county, as theretofore authorized by the electors, bearing date as of December 31, 1872, for the principal sum of $150,000, in denominations of $500 each, payable in 20 years from their date, with interest from their date at the rate of 8 per cent. per annum, as per coupons attached, the interest and 2 per cent. of the principal payable on the 1st day of January of each year, commencing January 1, 1874.

(17) That if the president of the Houston & Great Northern Railroad Company and the other agents of said company were not expressly authorized by it to make the contracts, promises, agreements and representations hereinbefore alleged (as plaintiffs expressly aver they were), yet the said Houston & Great Northern Railroad Company was nevertheless bound thereby; for plaintiffs aver that the said Houston & Great Northern Railroad Company, with full knowledge of the facts hereinbefore pleaded, acquiesced in, approved, and ratified each and all of the aforesaid contracts, promises, agreements, and representations of its said president, and of its other agents, with the intention to adopt same and to be bound thereby, and, with such knowledge, obtained and accepted the services of Judge John H. Reagan, as above shown, and obtained, accepted, and retained the above-mentioned bonds of Anderson county, as well as the proceeds thereof; and this plaintiffs are ready to verify.

(18) That on or about the 19th day of February, 1872, the International Railroad Company and the Houston & Great Northern Railroad Company, acting by their respective presidents, entered into certain written "Articles of Agreement," whereby it was provided that the railroads, properties, rights, franchises, powers, and capital stock of the two companies should be united, consolidated, and merged, under the name of the International & Great Northern Railroad Company, on authorization of the holders of three-fourths of the outstanding stock of the respective companies, and, in the meantime the railroads, properties, rights, franchises, and powers of the two companies were to be managed, operated, and exercised by their respective boards of directors, or by the joint action of the two boards, all earnings to belong, however, to the united company. That in September, 1873, said union, consolidation, and merger was duly approved by the stockholders of the respective companies, and the same were also approved, ratified, and confirmed by the Legislature of the state of Texas, by acts approved, respectively, on the 24th day of April, 1874, and on the 10th day of March, 1875.

(19) That by section 2, of the act of April 24, 1874, it was expressly provided that all acts theretofore done in the name of either of said companies should have the same binding force and effect upon the International & Great Northern Railroad Company that they had upon the respective companies.

(20) That the Houston & Great Northern Railroad Company, and the International & Great Northern Railroad Company (as formed by the consolidation agreement aforesaid), in part performance of the aforesaid contracts, promises, and agreements, and in compliance therewith, promptly established the machine shops and roundhouses of the Houston & Great Northern Railroad and of the International & Great Northern Railroad, at Palestine, Tex., and thereafter, until the 13th day of September, 1911, and for a period of nearly 40 years, the machine shops and roundhouses of the Houston & Great Northern Railroad, and of the International & Great Northern Railroad, in further performance of said contracts, promises, and agreements, were continuously maintained, by the Houston & Great Northern Rail-

road Company and by the International & Great Northern Railroad Company, at Palestine, Tex., where the same have also been, and now are, maintained by the International & Great Northern Railway Company.

(21) That heretofore, to wit: On or about the first of the year 1875 (plaintiffs being unable after this lapse of time to more definitely fix the date), the International & Great Northern Railroad Company, acting by its duly authorized general manager, or general superintendent, H. M. Hoxie, contracted and agreed with the citizens of the city of Palestine, Tex., among whom were the plaintiffs Geo. A. Wright and J. W. Ozment, to fully and completely perform the promises, contracts, and agreements of the Houston & Great Northern Railroad Company, or the promises, contracts, and agreements which the said Galusha A. Grow had undertaken to make in behalf of said company, with said citizens and with Anderson county and with the electors of said county, by at once locating the general offices of the International & Great Northern Railroad at Palestine, and by thereafter forever keeping and maintaining the general offices, machine shops, and roundhouses of said International & Great Northern Railroad at Palestine, for and in consideration of the bonds theretofore issued by Anderson county to the Houston & Great Northern Railroad Company, and for the further additional consideration that said citizens should at once construct and complete, or cause to be constructed and completed, at their own cost and expense, any and all houses, at Palestine, Tex., which might be demanded by the International & Great Northern Railroad Company, in accordance with such plans or specifications or directions as might be furnished by the company, through its officers, for occupancy, at reasonable rentals, by employés of said company and their families, and especially by general officers of said company, their families and clerks.

(22) That the citizens of Palestine, as required by said contract and agreement, did at once, in the early part of the year 1875, construct and complete, and cause to be constructed and completed, at their own cost and expense, amounting to many thousands of dollars, each and all of the houses, at Palestine, Tex., which were demanded by the International & Great Northern Railroad Company, and by its officers, numbering more than 20, in accordance with the plans and directions furnished by the company and its officers, for occupancy, at reasonable rentals, by the employés of said company and their families and clerks, to the entire satisfaction of the International & Great Northern Railroad Company; and that among the houses so constructed and completed, or caused to be so constructed and completed by said citizens were the following, to wit: A residence constructed and completed on lot 15 of Larkin & Campbell's addition to the city of Palestine, Tex., by the Palestine Land & Building Company, a corporation organized under the laws of Texas, with its place of business at Palestine, Tex., with its capital stock owned by many citizens of Palestine; a residence constructed and completed by remodeling and reconstructing the former Reeves home, on lot 14 of Larkin & Campbell's addition to the city of Palestine, Tex., by said Palestine Land & Building Company; a residence on the west half of lot 13 of Larkin & Campbell's addition to the city of Palestine, Tex., by said Palestine Land & Building Company; three residences on lot 4 of Larkin & Campbell's addition to Palestine, Tex., by said Palestine Land & Building Company; a residence on lot 2, in block 11, of the city of Palestine, by said J. W. Ozment; a residence on part of block 89 of the city of Palestine, Tex., by said J. W. Ozment; and two residences on lot 5 of Larkin & Campbell's addition to the city of Palestine, by Geo. A. Wright

and J. E. Whiteselle, who were both citizens of said city. That owing to the lapse of nearly 39 years, these plaintiffs are unable to state with any greater particularity the location of other houses and by whom constructed, under the terms of said contract, but they aver that said railroad company accepted the buildings which were constructed, and the work which was done, and caused to be done, by said citizens as in full and complete and perfect performance of said contract, as in truth and in fact such buildings and work did fully and completely comply with every obligation of said citizens under said contract; and thereupon the said International & Great Northern Railroad Company became bound, by its aforesaid contract and agreement (as well as by the previous contract and agreement of one of its constituents), to forever keep and maintain the general offices, machine shops, and roundhouses of the International & Great Northern Railroad at Palestine.

(23) That if the general manager or general superintendent of the International & Great Northern Railroad Company, H. M. Hoxie, was not expressly authorized by said company to make the contract and agreement hereinbefore set out, which he did make, in behalf of said company with the citizens of Palestine (as plaintiffs expressly aver he was), yet the International & Great Northern Railroad Company was nevertheless bound thereby; for plaintiffs aver that said company, with full knowledge of said contract and agreement, acquiesced in, approved, and ratified same, with the intention to adopt it and be bound thereby, and, with full knowledge, said company accepted the benefits of the expenditures made by the citizens of Palestine in the construction of houses for its employés, as above shown; and, in performance of its obligations under said contract and agreement, the International & Great Northern Railroad Company did immediately, and in the early part of the year 1875, locate and establish the general offices of the International & Great Northern Railroad at Palestine, and did thereafter continuously maintain such general offices, at Palestine, until the 1st day of September, 1911; and, in compliance with the aforesaid contract and agreement, the International & Great Northern Railroad Company and the International & Great Northern Railway Company have continuously maintained the machine shops and roundhouses of the International & Great Northern Railroad at Palestine from the date of said contract and agreement to the present time.

(24) That under the laws of Texas the International & Great Northern Railroad Company had, prior to the 9th day of May, 1911, become the owner of 1,106 miles of railroad, extending from Palestine to Houston, from Longview, via Palestine, to Laredo, and from Spring to Ft. Worth, with several branches, spurs, and terminals, and had also become the owner of trackage rights over 53.5 miles of railroad, including the Galveston, Houston & Henderson Railroad, from Houston to Galveston, together with the franchise to operate said 1,106 miles of railroad and said 53.5 miles of railroad, as a common carrier of freight and passengers for hire, and had become the owner of valuable equipment and other property connected with said lines of railroad and the operation thereof. That said railroads, franchises, equipment, and other property were owned and held by the International & Great Northern Railroad Company, on said 9th day of May, 1911, subject to the lien of a mortgage, of date November 1, 1879, securing bonds in the principal sum of $11,291,000, and also subject to the lien of a mortgage, on specific property, securing certain bonds known as Colorado river bridge bonds, in the principal sum of $198,000, and also subject to the lien of a mortgage, on specific property,

securing a loan upon the company's San Antonio Station in the principal sum of $42,000, and also subject to a lien on certain equipment for the principal sum of $392,650, and also subject to the lien of a mortgage, of date March 1, 1892, securing bonds in the principal sum of $2,966,052.50, besides interest, and also subject to a valid subsisting judgment and decree of foreclosure, against the International & Great Northern Railroad Company, of the lien of a mortgage, dated June 15, 1881, for the sum of $12,165,545.60, with 6 per cent. per annum interest from May 10, 1910, said judgment and decree of foreclosure providing that said railroads, franchises, equipment, and the other property of said railroad company should be sold subject to the lien of the mortgage of date November 1, 1879, and also subject to the lien of the mortgage securing said Colorado river bridge bonds, and subject to the lien of the mortgage securing said loan on the San Antonio Station, and also subject to the lien on said equipment, but not providing that said railroads, franchises, equipment, and other property should be sold subject to the lien of said mortgage of date March 1, 1892, though the trustee, under the mortgage of date March 1, 1892, was a party to said judgment and decree of foreclosure, and though such trustee, and the holders of the bonds secured by said mortgage of date March 1, 1892, were bound by said judgment and foreclosure.

(25) That said railroads, franchises, equipment, and other property of the International & Great Northern Railroad Company were sold by a master commissioner appointed by said court, under the aforesaid judgment and decree of foreclosure, on the 13th day of June, 1911, when one Frank C. Nicodemus, Jr., of New York, bid in and purchased said railroads, franchises, and equipment and other property for the sum and price of $12,645,000, and the bid of said Frank C. Nicodemus, Jr., was thereafter, on June 14, 1911, duly accepted and confirmed by the court rendering said judgment and decree of foreclosure.

(26) That thereafter, on or about the 10th day of August, 1911, the said Frank C. Nicodemus, Jr., and certain nominal associates, filed in the office of the Secretary of State of the state of Texas a certain charter forming a corporation, under article 4550 of chapter 11 of Title 94 of the Revised Civil Statutes of Texas, as amended by the act of the Legislature of Texas, approved September 1, 1910, under the name of the "International & Great Northern Railway Company," for the purpose of acquiring, owning, maintaining, and operating the railroads theretofore forming the International & Great Northern Railroad, with an authorized capital stock of $11,500,000, divided into 115,000 shares, of the par value of $100 each, of which 50,000 shares should be preferred stock and 65,000 shares should be common stock, and thereby was created the defendant International & Great Northern Railway Company.

(27) That subsequent to the filing of said charter, and on or about the 13th day of September, 1911, the said purchaser, Frank C. Nicodemus, Jr., complied with his bid of $12,645,-000 for said railroads and other property, and thereupon, by direction of said purchaser, and in accordance with an assignment of his bid, and with the approval of the court, decreeing and confirming the sale, the railroads forming the International & Great Northern Railroad, and all appurtenant property, franchises, and equipment, by said master commissioner, were conveyed unto said new corporation, the defendant International & Great Northern Railway Company. That the International & Great Northern Railroad Company joined in said conveyance, in confirmation of said sale.

(28) That thereafter, on the 25th day of September, 1911, the court ordering and decreeing the sale of said railroad and appurtenant property, franchises, and equipment made and entered a final order and decree approving the final report of the master commissioner making said sale, and confirming his deed of conveyance to the International & Great Northern Railway Company, and forever and finally discharging all the railroads, franchises, and properties of the International & Great Northern Railroad Company from the possession, custody, and control of said court.

(29) That the said Frank C. Nicodemus, Jr., had full and actual knowledge and notice of the facts herein pleaded, and of every right herein asserted, prior to the time that he bid in the International & Great Northern Railroad, with its appurtenant property, franchises and equipment, and the defendant has had such actual knowledge and notice, from the time of its organization to the present time. That plaintiffs gave formal, written notice of the causes of action herein alleged unto said purchaser in advance of his bidding for said railroad and appurtenant property, franchises, and equipment, and in advance of compliance with his bid, and this plaintiffs are ready to verify.

(30) That since the Houston & Great Northern Railroad Company contracted and agreed to locate, keep, and maintain the general offices, machine shops, and roundhouses of the Houston & Great Northern Railroad at the city of Palestine, for a valuable consideration received, and since the International & Great Northern Railroad Company contracted and agreed to locate, keep, and maintain the general offices, machine shops, and roundhouses of the International & Great Northern Railroad at the city of Palestine, for a valuable consideration received, and since the general offices, machine shops, and roundhouses of the Houston & Great Northern Railroad and of the International & Great Northern Railroad have been located at the city of Palestine, in Anderson county, Tex., which county has aided said Houston & Great Northern Railroad and said International & Great Northern Railroad, by an issue of bonds, in consideration of such location being made, and since no certain place was named in the charter of the International & Great Northern Railroad Company where its general offices should be located and maintained, the laws of Texas, on the 1st day of September, 1911, and continuously afterwards to the present time, imposed, and do now impose, upon the International & Great Northern Railway Company the performance of the public and statutory duty, inuring to plaintiffs' special benefit, to keep and maintain the general offices, machine shops, and roundhouses of the International & Great Northern Railroad at the city of Palestine, in Anderson county; and the state of Texas, by general law, expressly forbade and prohibited, and still forbids and prohibits, any change, from the said city, in the location of said general offices, machine shops, and roundhouses. That the International & Great Northern Railroad Company, prior to the sale of its railroad and other property, was not only bound by contract, but was bound by general law, as a part of its duty to the public, coupled with the enjoyment of its corporate franchises, to keep and maintain the general offices, machine shops, and roundhouses of said railroad at the city of Palestine, and such duty and regulation of its franchises could not be, and was not, impaired nor discharged by the sale of said railroad, with its appurtenant property and franchises, and the organization of defendant to operate said railroad under said franchises.

(31) That the general offices, maintained at the city of Palestine, for the operation of the International & Great Northern Railroad (whether by the company or by receivers), for years prior to the 1st day of September, 1911, included that of vice president, secretary, treas-

urer, auditor, general freight agent, general manager, general superintendent, general passenger and ticket agent, chief engineer, superintendent of motive power and machinery, master mechanic, master of transportation, fuel agent, and general claim agent.

(32) That in willful disregard of its contract obligations unto plaintiffs, and in open and flagrant violation of the laws of the state of Texas, the defendant, International & Great Northern Railway Company, on or about the 1st day of September, 1911, undertook to change the location of all its general offices, except that of superintendent of motive power and machinery and that of master mechanic, from the city of Palestine to the city of Houston, Tex., and undertook to establish the most important general office of its traffic manager without the state of Texas, in the city of New Orleans, in the state of Louisiana; and, in seeking to accomplish such changes, the defendant has caused the vice president and general manager, secretary, treasurer, auditor, general freight agent, general superintendent, general passenger and ticket agent, chief engineer, master of transportation, fuel agent, and general claim agent, with their respective subordinates, engaged in the operation of the International & Great Northern Railroad, to remove to the city of Houston, in Harris county, Tex., and to there establish so-called general offices, from which their respective duties are performed; and the defendant has' caused the traffic manager for the International & Great Northern Railroad, together with his subordinates, to establish an office at New Orleans, La., from where their duties are performed.

(33) That plaintiffs were advised that the defendant had declared the purpose to change from the city of Palestine the location of the general offices of said superintendent of motive power and machinery, and of said master mechanic, and to change the location of the machine shops and roundhouses of said railroad, as actually operated, immediately upon the institution of this suit, or of any suit of a like nature; and the defendant will make the aforesaid changes, in further violation of law, unless prevented by the restraint of the writ of injunction.

(34) That, acting upon the faith and credit of the contracts and agreements hereinbefore pleaded, and in reliance thereon, the plaintiffs have acquired property rights in the city of Palestine worth many hundreds of thousands of dollars.

(35) That plaintiffs have been irreparably damaged by the transfer from Palestine of the general officers, and their subordinates, numbering some 250 men, with an estimated pay roll of $250,000 annually, such removal having greatly reduced the volume of business in said city and having materially depreciated all property values therein, and such damage, already amounting to over $100,000 when this suit was brought, has continued and increased, and will continue and increase until the return of said officers and their subordinates to their rightful location.

(36) That should the defendant cease to maintain and operate said machine shops and roundhouses and the general offices of said superintendent of motive power and machinery and master mechanic, at the city of Palestine, with their annual pay roll far in excess of that of the removed general offices, as threatened by defendant, such action would destroy or depreciate plaintiffs' property to an amount far in excess of half a million dollars, and would imperil and largely sacrifice the property and business interests of said city, and there would be no way to measure the resulting injury nor to make compensation therefor, and the damages thus sustained would be inestimable and irreparable, and this plaintiffs are ready to verify.

(37) That while the damages which would be sustained by plaintiffs by the continued absence of defendant's general officers and their subordinates from Palestine during the pendency of this suit would be great and irreparable, the trouble and cost to defendant of restoring such officers, with their subordinates, books, and records, to Palestine, would be so slight and inconsiderable as to be trivial—the transfer from Palestine to Houston having been effected within a few hours, over defendant's own railroad, and by means of defendant's own trains—and the return could be as easily and cheaply accomplished.

(38) That said general officers were transferred to Houston, with actual knowledge and notice, upon the part of the defendant, that this suit would be promptly brought, and that application would be made for a peremptory injunction, to restore the status of said general offices, machine shops, and roundhouses, as they existed when the controversy arose between plaintiffs and defendant as to their location, and as such status had existed for more than 30 years.

(39) That plaintiffs' original petition was presented to the court at the earliest possible moment after plaintiffs became possessed, through exercising the utmost diligence, of actual knowledge as to the material facts alleged in said petition.

(40) That plaintiffs have no adequate remedy at law for the wrongs and injuries inflicted upon them by defendants, nor to prevent the grievous wrongs and injuries with which they are threatened by the defendant, and in no other way can plaintiffs have any complete or adequate remedy for the wrongs and injuries already suffered by them, nor to prevent those with which they are threatened, save by means of the writ of injunction.

(41) That Hon. B. H. Gardner, judge of the Third judicial district of Texas, and judge of the district court of Anderson county, Tex., when this suit was filed in said court, was one of the citizens of the city of Palestine in whose behalf this suit was brought, and was the owner of property in said city, and he was also the father of the wife of the plaintiff R. C. Sewell, and hence said judge was disqualified to hear and to act upon plaintiffs' application for temporary injunction, or to make any orders herein.

(42) Wherefore plaintiffs applied to the honorable judge of the district court of Cherokee county, Tex., who, on the 7th day of February, 1912, ordered a writ of injunction to issue, commanding the defendant International & Great Northern Railway Company to desist and refrain from changing the location of the machine shops and roundhouses of the International & Great Northern Railroad, as operated by the defendant, from the city of Palestine, and to desist and refrain from changing the location of the general offices of the superintendent of motive power and machinery, and the master mechanic, engaged in the operation of said railroad, from the city of Palestine, which writ of injunction was duly issued and served on defendant, and which injunction, in so far as it commands the foregoing acts, is still in full force and effect.

(43) And, plaintiffs pray, the defendant having answered, that the court will hear proof, and that plaintiffs may have judgment, establishing the contracts and agreements herein pleaded, and for judgment enforcing the public duty of defendant to forever keep and maintain its general offices, machine shops, and roundhouses at the city of Palestine, and that plaintiffs may have judgment that the temporary injunction, granted as aforesaid, be made perpetual, and for a mandatory injunction commanding defendant to at once desist and refrain from keeping or maintaining any other general offices, in connection with the operation of said railroad at any other place than the city of Palestine, and commanding and requiring the defendant to keep and maintain all of the general offices for the operation of said railroad at the city of Palestine, and for all other and further relief, special and gen-

eral, in law and in equity, to which plaintiffs may be rightly and justly entitled.

A. G. Greenwood,
Campbell, Sewell & Strickland,
Thos. B. Greenwood,
Jno. C. Box,
R. O. Watkins,
John B. Guinn,
Perkins & Perkins,
Attorneys for Plaintiffs.

The State of Texas, County of Anderson.

I, Geo. A. Wright, do solemnly swear that I am one of the plaintiffs in the foregoing petition, and that the facts and statements contained in said petition are true to my knowledge and belief, and that I make this affidavit in behalf of, and as agent for, my coplaintiffs in said petition and myself. Geo. A. Wright.

Subscribed and sworn to before me by Geo. A. Wright, this the 19th day of December, 1913.

[L. S.] E. T. McCain,
Clerk of the District Court of Anderson County, Texas.

The State of Texas, County of Anderson.

I, Mrs. Mollie Ford Reagan, do solemnly swear that I am the widow of Judge John H. Reagan, formerly of Anderson county, Tex.; that I was present at the home of myself and Judge John H. Reagan, then my husband, on or about the 15th day of March, 1872, when Galusha A. Grow, acting in behalf of the Houston & Great Northern Railroad Company, offered to extend the line of the Houston & Great Northern Railroad to Palestine, and I know, of my own personal knowledge, that as a consideration for the bond issue desired from Anderson county by said company, in aid of the construction of said railroad, the company, through President Grow, offered unto the citizens of the city of Palestine, then represented by Judge Reagan, to locate and establish, and to thereafter forever maintain, the general offices, machine shops, and roundhouses of the Houston & Great Northern Railroad, at the city of Palestine; that the plaintiff Geo. A. Wright was present when said offer was made; that I believe all of the averments of the foregoing petition to be true; and that this affidavit is made in behalf of the plaintiffs in said petition.

Mrs. Mollie Ford Reagan.

Subscribed and sworn to before me, by Mrs. Mollie Ford Reagan, on this the 19th day of December, 1913.

[L. S.] E. T. McCain,
Clerk of the District Court of Anderson County, Texas.

The State of Texas, County of Anderson.

I, J. W. Ozment, do swear that I am one of the plaintiffs in the foregoing petition; that I was a party to the contract and agreement between the citizens of Palestine and the International & Great Northern Railroad Company, on or about the first of the year 1875, and that the averments of said petition relative to said contract and agreement and relative to compliance therewith by the citizens of Palestine, to the satisfaction of said company, are true; and I make this affidavit in behalf of, and as agent for, my coplaintiffs in said petition and for myself.

J. W. Ozment.

Subscribed and sworn to before me, by J. W. Ozment, on the 19th day of December, 1913.

[L. S.] E. T. McCain,
Clerk of the District Court of Anderson County, Texas.

Judgment.

Anderson County et al. v. I. & G. N. Ry. Co. No. 6415.

Filed January 17, 1914.

Recorded in volume M, pages 191–194.

On this the 7th day of January, 1914, the above-entitled cause came on to be heard before Hon. A. E. Davis, judge of the First judicial district of Texas, presiding as judge of the district court of Cherokee county, Tex., he having exchanged districts with Hon. Lee D. Guinn, judge of the Second judicial district of Texas, and holding court at Rusk, instead of the said Hon. Lee D. Guinn, this being deemed expedient by both of said judges.

And now on this the 7th day of January, 1914, came on for hearing the plea to the jurisdiction and the plea in abatement contained in defendant's first amended original answer, together with the replication thereto contained in plaintiffs' first supplemental petition, when the plaintiffs and defendant, by their attorneys, agreed hat the court should pass upon and determine the issues presented by said plea to the jurisdiction and plea in abatement and said replication without a jury, and the court, after considering said plea to the jurisdiction and plea in abatement, and the replication thereto, and the evidence thereon, finds that said plea to the jurisdiction and plea in abatement should not be sustained; and it is therefore ordered and decreed by the court that the plea to the jurisdiction and the plea in abatement contained in defendant's first amended original answer be, and the same are hereby, overruled, to which ruling of the court the defendant duly excepted.

And, now on this the 7th day of January, 1914, came on to be heard the general demurrer and the 18 special exceptions contained in defendant's first amended original answer to plaintiff's first amended original petition, and the court, having carefully considered said petition, and said general demurrer and special exceptions, finds that said general demurrer and each and all of said special exceptions should not be sustained, and it is therefore ordered by the court that said general demurrer and each and all of said special exceptions be, and the same are hereby, overruled, to which findings and rulings of the court the defendant duly excepted.

And now on this the 8th day of January, 1914, the above entitled and numbered cause was regularly called for trial, when the plaintiffs appeared by their attorneys and announced ready for trial, and the defendant appeared by its attorneys and announced ready for trial, and thereupon came a jury of good and lawful men, to wit, J. M. Meador, foreman, and 11 others, to whom were submitted seven distinct and separate questions, after they had been duly impaneled and sworn, to which questions after hearing the pleadings, evidence, argument of counsel, and instructions of the court, the jury on this the 17th day of January, 1914, returned into open court, on their oaths, seven distinct and separate answers, in writing, duly signed by their foreman, which questions and answers were as follows, to wit:

"Question No. 1: Do you find from the preponderance of the evidence that the Houston & Great Northern Railroad Company, acting by its president, Galusha A. Grow, on or about the 15th day of March, 1872, contracted and agreed, with the citizens of Palestine, acting by John H. Reagan, to extend its line of railroad to intersect the International Railroad at Palestine, and to establish a depot within a half mile of the courthouse at Palestine, and to commence running cars regularly thereto by July 1, 1873, and to thereupon locate and forever thereafter maintain the general offices, machine shops, and roundhouses of the Houston & Great Northern Railroad, at the city of Palestine, for and in consideration of an agreement (if any), by John H. Reagan, to make a thorough canvass of Anderson county, to induce the electors of that county to authorize the issuance of interest-bearing bonds of the county in the principal sum of $150,000, and upon the further consideration that Anderson county, on authorization of its electors, should issue and deliver its bonds, in the principal sum aforesaid? Answer to question No. 1: Yes.

··"Question No. 2: Do you find from the preponderance of the evidence that Anderson county, on authorization of its electors, issued and delivered to the Houston & Great Northern Railroad Company its interest-bearing bonds in the principal sum of $150,000, within a year from the date of the contract and agreement mentioned in question No. 1, if you find there was any such contract and agreement; and that Judge John H. Reagan made a thorough canvass of Anderson county to induce the electors to vote said bonds, and that the Houston & Great Northern Railroad Company and the International & Great Northern Railroad Company, in part performance of the contract and agreement mentioned in question No. 1, if you find there was any such contract and agreement, and in compliance with said contract and agreement, if any, established and thereafter maintained at Palestine, the machine shops and roundhouses of the Houston & Great Northern Railroad and of the International & Great Northern Railroad? Answer to question No. 2: Yes.

"Question No. 3: Do you find from the preponderance of the· evidence that the Houston & Great Northern Railroad Company authorized or ratified the action of Galusha A. Grow in making (if you find that he did make) the contract and agreement mentioned in question No. 1? In determining whether the Railroad Company authorized or ratified the action in its behalf, if any, of Galusha A. Grow, you are instructed that the power to authorize or ratify such action was vested in the company's board of directors, and your answer to this question No. 3 should be determined by your finding from the evidence as to whether a board of directors of the company conferred the authority on said Grow to make the contract and agreement (if any), or, knowing of his having exercised such authority (if he did so), approved of his action. It is not necessary, in order to bind a railroad company by the action of an assumed agent, that the board of directors should have caused to be spread upon their minutes a formal resolution expressly authorizing or approving the action claimed to have been authorized or ratified, nor is it necessary, in order to bind a railroad company by the action of an assumed agent, that the board of directors should have both authorized and ratified the action of the assumed agent; but it is necessary that such action should be either authorized or ratified by the board of directors. Answer to question No. 3: Yes.

"Question No. 4: Do you find from the preponderance of the evidence that about the first of the year 1875 the International & Great Northern Railroad Company, acting by its general superintendent, H. M. Hoxie, contracted and agreed with the citizens of the city of Palestine, among whom were the plaintiffs Geo. A. Wright and J. W. Ozment, to fully and completely perform a previous contract and agreement, if any there was, between the Houston & Great Northern Railroad Company, acting by Galusha A. Grow and the citizens of Palestine, acting by John H. Reagan, by at once locating the general offices of the International & Great Northern Railroad at Palestine, and by thereafter forever keeping and maintaining the general offices, machine shops, and roundhouses of said International & Great Northern Railroad at Palestine, for and in consideration of certain bonds of Anderson county theretofore issued to the Houston & Great Northern Railroad Company, and for the further and additional consideration that said citizens should at once construct and complete, or cause to be constructed and completed, at their own cost and expense, any and all houses at Palestine, Tex., which might be demanded by said company, in accordance with such plans or directions to be furnished by the company, through its officers, for occupancy, at reasonable rentals, by employés of said company and their families, and especially by general officers, their families and clerks? Answer to question 4: Yes.

"Question No. 5: Do you find from the preponderance of the evidence that the citizens of Palestine did, in the early part of the year 1875 and within 12 months from the date of the contract between certain citizens of said city and the International & Great Northern Railroad Company (if such contract there was), construct and complete, or cause to be constructed and completed, at their own cost and expense, certain houses at Palestine, Tex., and that the same, if any, were all the houses which were demanded by the International & Great Northern Railroad Company, and that said houses, if any, were constructed and completed, in accordance with the plans or directions furnished therefor (if any), by said company, through an officer of same, for occupancy, at reasonable rentals, by the employés of said company, including general officers, their families and clerks? Answer to question No. 5: Yes.

"Question No. 6: Do you find from the preponderance of the evidence that the International & Great Northern Railroad Company authorized or ratified the action of H. M. Hoxie in making (if you find he did make) the contract and agreement, of date early in 1875, mentioned in question No. 4? In this connection, you are charged that if you find from the preponderance of the evidence in this case that the International & Great Northern Railroad Company, after its formation by the consolidation of the Houston & Great Northern Railroad Company with the International Railroad Company, and early in the year 1875, did, through its general superintendent, H. M. Hoxie, contract and agree with certain citizens of the city of Palestine, including plaintiffs Wright and Ozment,, that in consideration of the bonds theretofore issued to the Houston and Great Northern Railroad Company, and in consideration that the citizens of Palestine should at once construct and complete, or cause to be constructed and completed, at their own cost and expense, such houses at Palestine, as might be demanded by said company, in accordance with plans or directions to be furnished by the company, through its officers, for occupancy, at reasonable rentals, by employés of said company and their families and clerks, the said International & Great Northern Railroad Company, on its part would at once locate the general offices of said company at Palestine, and forever thereafter keep and maintain the general offices, machine shops, and roundhouses of said International & Great Northern Railroad at Palestine, and would thereby fully and completely carry out and perform the contract between the Houston & Great Northern Railroad Company, acting by Galusha A. Grow, and the citizens of Palestine, acting by John H. Reagan (if any such contract there was), and if you further find, from the preponderance of the evidence, that the International & Great Northern Railroad Company had full knowledge of said contract between the citizens of Palestine and the Houston & Great Northern Railroad Company, if any, and of its terms, if any, and of said contract and agreement between certain citizens of Palestine and said general superintendent, H. M. Hoxie, if any, and of its terms, if any, and if you further find that in pursuance ·of said last mentioned contract and agreement, if any, certain citizens of Palestine at once constructed and completed, or caused to be constructed and completed, at their own cost and expense, any and all houses demanded under said contract and agreement (if any), in full compliance with their obligations to said company under said contract and agreement, if any. to the satisfaction of said company; and, if you further find that the International & Great Northern Railroad Company, acting by its board of directors, in pursuance

of said contract and agreement of date early in the year 1875 (if any there was), and with the intention to adopt same (if any), and to perform the obligations imposed by said contract and agreement (if any), on said company, did locate and establish the general offices of the International & Great Northern Railroad at Palestine, then you should answer this question No. 6 with the word, 'Yes,' but, if you fail to so find, then you should answer this question No. 6 with the word, 'No.' Answer to Question No. 6: Yes.

"Question No. 7: Do you find from a preponderance of the evidence that in the event that the International & Great Northern Railway Company should be required to keep and maintain its shops at Palestine, Tex. forever, no burden or injurious effect would thereby be placed upon, or suffered by, interstate commerce? Answer to question No. 7. Yes."

And now, on this the 17th day of January, 1914, the court does in all things approve the verdict and findings of the jury, in answer to the questions submitted to them, and it is thereupon considered, ordered, adjudged, and decreed by the court that the plaintiffs, Anderson county, city of Palestine, Geo. A. Wright, J. W. Ozment, A. L. Bowers, Jno. R. Hearne, Z. L. Robinson, E. W. Link, R. C. Sewell, Jno. M. Colley, and P. H. Hughes, for and on behalf of all citizens of the city of Palestine, do recover judgment against the defendant, International & Great Northern Railway Company, as follows, to wit:

It is considered, ordered, adjudged, and decreed by the court that the defendant, International & Great Northern Railway Company, shall forever keep and maintain the general offices, machine shops, and roundhouses, for the operation of the International & Great Northern Railroad, in the city of Palestine, in the county of Anderson, in the state of Texas, where the Houston & Great Northern Railroad Company and the International & Great Northern Railroad Company have contracted and agreed to forever keep same, for valuable considerations received.

It is also considered, ordered, adjudged, and decreed by the court that the defendant International & Great Northern Railway Company, be and it is hereby perpetually enjoined and restrained from changing the location of the machine shops and roundhouses of the International & Great Northern Railroad, as operated by defendant, from the city of Palestine, and that the defendant, International & Great Northern Railroad Company, be and it is hereby perpetually enjoined and restrained from keeping or maintaining the general offices of the vice president and general manager, secretary, treasurer, auditor, general freight agent, traffic manager, general superintendent, general passenger and ticket agent, chief engineer, master of transportation, fuel agent, general claim agent, superintendent of motive power and machinery, and master mechanic, engaged in the operation of the International & Great Northern Railroad, at any other place than the city of Palestine.

It is also adjudged and decreed by the court that the plaintiffs do have and recover of and from the defendant all costs herein, for which let execution issue.

It is further adjudged and decreed by the court that the officers of court do have and recover of each party hereto all costs incurred by each respectively, for which execution may issue.

To all of which judgment defendant excepted.
A. E. Davis, Judge Presiding.

LEVY, J. (after stating the facts as above). [25] The pertinent provision of the Constitution reads:

"No judge shall sit in any case wherein he may be interested, or where either of the parties may be connected with him, either by affinity or consanguinity, within such a degree as may be prescribed by law, or when he shall have been counsel in the case." Article 5, § 11.

The disqualifying relationship is fixed by law to the third degree. Article 1584, R. S. The constitutional provision very clearly expresses that such relative must be one of the parties to the cause to render the judge incompetent. And the rule laid down as a test of when a person is a party to the suit, within the meaning and spirit of this provision of disqualification to the judge, comprehends a person named in the pleading or a person so directly affected by the judgment in the particular case as in legal effect to be a party to the suit. This is the rule applied by the Supreme Court in the cases discussed. In Hodde v. Susan, 58 Tex. 392, a surety on a claimant's bond was held to be a party to the statutory proceeding to try the right of property, upon the ground that in legal effect the surety on the bond was an active party to the suit.

"The sureties," it was observed, "have a right to protect their interests by interposing a defense to the suit, taking such control over its proceedings as will prevent loss to them by neglect or inattention, and finally of appealing to a higher court, if in their opinion an erroneous judgment has subjected them to loss or damage. Here, then, we have all the characteristics of a party to a suit combined in such surety."

In Burch v. Watts, 37 Tex. 135, a surety on an attachment bond was in legal effect such a party to the record as entitled him to move to quash it. In Weir v. Brooks, 17 Tex. 638, a surety on the bond of a defendant in a distress warrant suit was in legal effect such a party to the suit as allowed him to take a writ of error to the Supreme Court. In Schultze v. McLeary, 73 Tex. 92, 11 S. W. 924, Orynski was a party defendant to the record, and his wife and the wife of the regular judge were sisters. The court held the judge disqualified upon the ground that the wife of Orynski was in legal effect an active party defendant to the suit and directly affected by the judgment. To the same effect is Jordan v. Moore, 65 Tex. 363. The court in Simpson v. Brotherton, 62 Tex. 170, clearly explains the legal reason for the holding, as in these two cases above, that the wife is in legal effect a party to the suit. It is stated:

"Our courts treat the relation of husband and wife towards the community property as that of a partnership. The business of the firm is transacted in the name of the husband, and he prosecutes and defends its suits with the same effect as if his partner were named in the case. Judgments in such suits bind both partners, or inure to their joint benefit if in their favor. In fact the wife is as much a party as if the record recited that the husband instituted or defended the suit for the use and benefit of himself and wife."

In Jordan v. Moore, supra, it was stated: "His wife was not nominally a party to the action, but she was so in legal effect." All these cases apply and follow the definition of

a party to an action as given in 1 Greenleaf on Evidence, § 535. In the case of Winston v. Marsterson, 87 Tex. 200, 27 S. W. 768, the Supreme Court again construed the word "parties," as used, as extending only to parties to the suit, named in the record or so in legal effect, and not including other persons "on account of some interest in the litigation." This decision is in harmony with the other cases and the general rule laid down by Greenleaf. If the word "parties" may extend to those named in the record or so in legal effect, the converse of the rule is that other persons are not parties merely "on account of some interest in the litigation." In other words, it is meant to say, as applied to the facts of that case, that "parties," as used, extends to the actual parties to the cause, named in the record or so in legal effect, but not to those who in the law of estoppel become privies to another and merely are affected by the judgment as regards the subject adjudicated. In the case of Duncan v. Herder, 57 Tex. Civ. App. 542, 122 S. W. 904, the daughter-in-law of the judge was the daughter of a defendant, who was made a party to the record in her capacity as survivor of her deceased husband and administrator of community estate of herself and her deceased husband. The suit was to cancel a judgment in favor of such survivor and administrator for debt and foreclosure of a lien on real estate.. The court held that the daughter-in-law, "Mrs. Moore, was a party to the suit within the meaning of that term as used in the Constitution," and that the judge was disqualified. Clearly, in the facts of that case, Mrs. Moore had a joint interest in the land and was actually represented in the suit by the administrator or legal trustee. The daughter-in-law, through the representation of the administrator or legal trustee, was directly affected by the judgment in regard to her property, and she and the administrator had in a sense a legal identity concerning the same community land in suit. The ruling in the facts of the case cannot reasonably be disapproved. It is not thought that this ruling overturns the rule applied in the Marsterson Case, supra, or conflicts with the rule applied in the other cases. when the facts are considered. And it is not thought that this case can be said to have construed the provision of law in hand as extending generally to all persons who may, in the law of estoppel, become privy to another and become affected by the judgment. In the instant proceedings the relatives of the judges are not named in the record, and on the facts would not be parties in legal effect unless the allegations of the named citizens in the petition who "sue in behalf of themselves and of all other citizens of said city of Palestine" make the unnamed persons parties to the suit within the meaning of the constitutional provision.

In the case of Cemetery v. Drew, 13 Tex. Civ. App. 536, 36 S. W. 802, the court stated:

"A petition or bill filed in the interest of a party and all persons similarly situated does not make the persons similarly situated parties to the suit."

When the question is one of common or general interest it is a rule of equity procedure, in the interest of convenience, that one or more persons might sue for all having a possible interest. The unnamed persons, though, are merely inchoate, and not active parties to the suit. Until the inchoate parties come into the record they have no control of the action, cannot appeal, and are not personally liable for costs, and therefore have none of the characteristics of a party to a suit. The judge may ascertain from the pleadings in the cause who are the parties to it, or in legal effect active parties to it, but he may not know what unnamed and merely inchoate parties may be interested, or possibly interested, or whether any such class of persons are related to him. And yet the validity of the judge's action must depend upon such a question if unnamed and merely inchoate parties are to be deemed parties to the suit within the letter and spirit of the constitutional article. It is thought that unless the unnamed parties come into the record, which they did not here, the allegations "in behalf of all other citizens" could be disregarded. The rule applied in Winston v. Marsterson is sound in interpretation and is applicable to the instant suit. The application of a different interpretation to the character of suit here would, it is believed, extend the disqualifying provision beyond its letter and spirit so as to cast uncertainty upon all rights acquired under judicial proceedings and make it almost impossible to carry on the administration of justice. In Hovey v. Shepherd, 105 Tex. 237, 147 S. W. 224, the suit reviewed directly interfered with the execution of a final judgment in another suit, and the parties were prohibited from so doing upon the ground that the matters adjudicated in the original suit were purely in the interest of the public, and the unnamed persons or class were bound by such adjudication. The court stated:

"If the interveners could litigate the issue, then, if defeated, any other citizen of the city could secure an injunction with as much justice and right as the injunction now threatened could be issued, and this might be followed up by each citizen, for interveners had no right superior to any other."

And this decision is clearly in line with principle and precedent. It is firmly predicated upon the principle that in the subject-matter litigated, affecting the interest of the public alike,. the judgment thereon declared the rights and liabilities of the railway company to the various members of the public interested, and the members of the public were concluded thereby, though not parties to the record. In the law of estoppel they were privies as regards the subject-matter litigat-

ed. The distinction between being a party to a suit, named in the record, or so in legal effect, as directly affected by the judgment, and not a nominal party, though being bound by the judgment, is of marked and material importance in a case of this character and purpose. A suit of this character and purpose is treated as one of general interest to the various members of the public interested, involving the same questions of law and fact; and as a means of convenient judicial test of this general interest, it is permitted to some, but not required of all the public similarly interested, to join as plaintiffs. The judgment declares the rights and liabilities of the defendant in respect to that general interest of the public in the matter litigated, and the defendant is entitled to have the judgment enforced finally and without interruption against the public interested. It is just to preclude or estop the unnamed public from interference with the final enforcement of the judgment in the cause instituted for the benefit of the public interested. They are in a sense privies, so that whatever binds one in relation to the subject of their general interest binds the others also. The ground of privity is not personal relation to the suit, but mutual relationship as regards the subject litigated, operating as estoppel. It is not doubted that a person, though not named as a party to the suit, may, in a particular case by estoppel, be concluded in his claim to property by a final judgment. The same reason and principle concluding a person by a judgment because of privity does not obtain to persuade the holding that unnamed or inchoate parties merely to a suit, who have not come into the record as active parties, would be such parties to the suit as to disqualify a judge from acting in the cause in a case of the instant character. It is thought that it is not enough in the instant suit to render a judge incompetent under terms of the law that he is related to some unnamed or inchoate party merely who may be affected by the judgment. As before said, a different construction would extend the provision of law beyond its letter and spirit so as to cast uncertainty upon all rights acquired under judicial proceedings. The question is approached with some delicacy by the court, but here determined as we believe the law requires. It is decided that the two judges referred to are not legally disqualified.